Donny KUYKENDALL, Appellant,

v.

The STATE of Texas, Appellee.

No. 59462.

Court of Criminal Appeals of Texas,
Panel No. 3.

Nov. 26, 1980.

Rehearing Denied Jan. 14, 1981.

Phil N. Vanderpool, Pampa, for appellant.

Harold L. Comer, Dist. Atty., Pampa, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, ODOM and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for the offense of murder in the course of and in furtherance of the commission of a robbery. On his plea of not guilty, the jury returned a verdict of guilt and assessed punishment at confinement for ten years, finding appellant had never before been convicted of a felony but refusing to recommend probation.

Appellant presents three grounds of error. First he contends the trial court erred in failing to include in its charge an appropriate instruction on criminally negligent homicide. Second, he complains because the trial court did not grant his motion for an instructed verdict—without differentiating for us a written motion at the close of the case-in-chief for the State and an oral motion after the State closed. Finally, he asserts that certain hearsay testimony was allowed to be submitted to the jury over his objection. Since the first and second grounds are related in that we must review at least portions of the testimony to determine whether the evidence raised the issue of criminally negligent homicide in the circumstances of the case, those two contentions will be examined more or less together. Then, if need be, the hearsay assertion will be addressed.

At the outset, though, we are met by a contention from the State that asserted error as to the failure of the trial court to charge on criminally negligent homicide is not properly before us. Particularly the State relies on the initial panel opinion in *Dirck v. State*, 579 S.W.2d 198 (Tex.Cr.App. 1978) then extant when its brief was written. On rehearing, however, the Court took another look and held the procedure that was followed preserved the objections to the charge of the trial court, *id.* at 202. Then *Briceno v. State*, 580 S.W.2d 842, 843 (Tex.Cr.App.1979) built on *Dirck* and held that substantially what occurred in the case at bar constituted compliance with amended Article 36.14, V.A.C.C.P. and thereby preserved the contention for review. Accordingly, the contention advanced by the State must now be rejected.

September 15, 1976 at a late evening hour in his home in Pampa one Jerry Oliver, a black man it is pertinent to note, was wounded in his left armpit area by a shotgun blast discharged at close range. That was the cause of his death the next day in an Amarillo hospital. Without dispute, the shotgun was held by appellant in his right hand as he kept a screen door open with his left hand and stepped through the front entrance into the home of Oliver. The only eyewitness to what then occurred is appellant, and directed by his attorney to look at the jury and tell what happened appellant related:

"Well, sir, I stepped into the house and I had the gun at the waist level, pointed out and Jerry was a few steps away and all I got out of my mouth was, Jerry, I—and he lunged at me and I—everything just started happening too fast.

I felt my arm pulled out and the gun came back. There was a report and my hand was the first thing I noticed—was my hand hurt and Jerry said, oh Lord. And, he fell down and I walked over to him. I looked down at him.

I was scared and I was shook up and I said, all I wanted was my money."

The gun was a sawed-off shotgun belonging to another from whose room appellant had taken it shortly before going to Oliver's house. According to the owner, the shotgun was defective in that the stock would not snap onto the barrel as it was designed to, and it was hazardous in that because of an unusually vigorous recoil action the thumb of a holder could be cut badly if he did not hold it in a certain manner. Appellant was still in the house when the woman who also lived there turned on a light; he saw the gun "all over the floor," picked up the pieces and departed, his hand having been "ripped open" and bleeding freely. He returned to an automobile occupied by three other persons and, when asked what happened, said, "The crazy nigger grabbed the gun." One of the four occupants, Dwayne Chapman, was dropped off at his home; the remaining three, appellant, Ru-

ben Garza and Cheryl Fisher, fled to Amarillo because appellant "didn't want to get caught right then. I needed time to think." On the way back to Pampa later in the morning, they stopped, wiped off fingerprints from and wrapped the shotgun pieces in a T-shirt from the floorboard of the automobile, bound them with the distinctive belt appellant had been wearing—appellant admitted that the woman at Oliver's home might be able to identify it—and stashed the bundle in a culvert.

The homicide, according to the theory pursued by the State, was the culmination of a series of happenings that those four young persons and others created from idleness that Thursday afternoon. Cheryl Fisher, herself an accused who had already pled and been found guilty by the trial court, testified at the instance of the State, as did Donnie Barton, a youngster who had started out in the company of Garza and was with him and the others until they finally left for Oliver's house, and Brian Campbell, the owner of the sawed-off shotgun. As indicated, appellant testified in his own behalf; so did Garza and Chapman. From their testimony a synopsis of the meanderings of the principal parties may be drawn.

Appellant and Cheryl were living together at the time; they left their residence and in her automobile went to the Wizard arcade, a "foosball parlor," where they met up with Garza and Barton, the latter having been drinking a good deal of beer. A decision was made to go in her car to obtain a lid of marihuana from Oliver, he being reputed to be a dealer in controlled substances. Garza went to the door of the Oliver home but was told by the woman that Oliver was not there. The company then drove by and stopped at the Peppermint Lounge when Garza saw one known as "Fuzzy." Garza related to Fuzzy the fruitless trip they had just made to Oliver's house, only to be told by Fuzzy that Oliver was at home and had some lids. This word greatly agitated Garza, and back in the car the talk turned to "ripping Jerry off" from

his marihuana. There was more drinking, some marihuana smoking off and on, and plans were discussed.

From this point on there is some divergence in the recitals of witnesses, more though in the reasons for things done than in the actual doing. Suffice to say from viewing the evidence most favorably to support the verdict of the jury, appellant drove the Fisher car to Campbell's house and acquired the shotgun, then went to Chapman's residence were Dwayne joined them with a weapon of his own and shells for the shotgun. Donnie Barton heard something said "about going and getting a nigger or something or other," professing not to remember but bits and pieces but finally recalling something said "about going over there probably to rip him off." Cheryl was certain there was talk "about ripping him off for his marihuana," it standing to reason, she thought and said, that if Oliver were selling lids he possessed pounds. When appellant remarked that he did not know Barton too well, Donnie said, "That is fine, you just take me to the house," and he was let off at his own home. The four remaining then went on to Oliver's home.

By nearly every account, when they reached their destination Garza went up to the front door of the house and, alone entered it [1] and had a brief conversation with Oliver. Meanwhile appellant had left the car and was standing in a spot where he could not easily be seen from the front door; as Garza was coming out of the house, he may have called out that Oliver did not have any marihuana, but he did notice Chapman motioning for him to come back to the car. Appellant approached the front door from an angle—Chapman said he "slithered along"—and startled Garza by momentarily pointing the shotgun waist level at him. Garza, not voicing another sound, turned away from the door and started to the car; before he got there appellant had entered the doorway and the shotgun was discharged.

1. There is some testimony that Cheryl went part of the way to the door with him, only to be called back to the car. Chapman remained in or at the car.

Right after appellant was released from jail he had a conversation with Campbell, from whose place he had obtained the shotgun; Campbell attributed to appellant the statements that when he had come by to get the shotgun appellant had wanted Campbell to go with him to Oliver's "to hold the gun on him" so he could get "some pot," but that he had not meant to shoot Oliver.

Appellant testified that he loaded the shotgun as he approached the house and went in the door with the shotgun pointed as it was because Oliver "pulled a gun on me before" and he "was well known for having guns and knives," and that he was afraid of him at that time. Appellant had his right hand around the stock, was nervous and was "just flipping the hammer and not looking, just working it back and forth" as he went into the house. The reason he left the car and went to see Oliver, appellant asserted, was because Oliver owed him some money and he wanted to collect it and settle the matter then and there. He told the jury on cross examination that during the conversations about ripping off Oliver he "may have said" what Garza testified he did say, viz:

"... that I had the gun there for the purpose of ripping Jerry Oliver's money and ripping Jerry Oliver off and taking his money or dope and ... [I wasn't] ... going to use it but that—unless ... [I] ... got in trouble."

 Considering the evidence in the fashion this reviewing Court is required to do, we find it sufficient to support the jury verdict. The trial court did not err in overruling the oral motion for an instructed verdict at the close of all the proof on the ground that it was insufficient, for clearly there was "evidence which the jury could have believed in arriving at such a verdict,"

Chase v. State, 573 S.W.2d 247, 249 n.1 (Tex.Cr.App.1978). Indeed, until appellant presented his version of how the homicide occurred, circumstantially there was not much room for doubt but that appellant had done just what he and his companions planned to do that evening. But we need not review the propriety of overruling the written motion made when the State had rested for in thereafter putting on a defense the appellant waived that contention. Shirley v. State, 501 S.W.2d 635, 637 (Tex. Cr.App.1973). Ground of error two is overruled.

With respect to failure to charge on criminally negligent homicide, since the original briefs were filed in this cause the Court has decided several cases on the point. We pause to note that in the cause before us a charge on the defense of accident was neither requested nor given by the trial court, a matter that troubled the Court when it first undertook to analyze the characteristics of criminally negligent homicide under the new penal code, V.T.C.A. Penal Code, §§ 19.07(a) and 6.03(d), in Dockery v. State, 542 S.W.2d 644, 647 ff.[2] (Tex.Cr.App.1976, On Motion for Rehearing); see also London v. State, 547 S.W.2d 27 (Tex.Cr.App.1977); Moore v. State, 574 S.W.2d 122 (Tex.Cr. App.1978) and Branham v. State, 583 S.W.2d 782 (Tex.Cr.App.1979) in each of which the judgment was reversed for failure to charge on criminally negligent homicide; Simpkins v. State, 590 S.W.2d 129 (Tex.Cr.App.1979), which did not; and compare Boles v. State, 598 S.W.2d 274, 278 (Tex.Cr.App.1980) in which "grave doubt" was expressed that the evidence raised that "lesser included offense." However, none of these cases arose out of a felony murder situation that implicates the theory of

2. "We conclude, therefore, that homicide is punishable only where the State proves both voluntary conduct and a culpable mental state. It follows that where criminal negligence has been proved ... the homicide may still *not* be subject to criminal penalties if the conduct which caused the homicide is not voluntary, and we so hold." [Emphasis in original] Id. at 650. But see the dissenting opinion of Judge Odom at 654:

"... The majority appear to hold that the absence either of a voluntary act or of a culpable mental state renders a homicide excusable as accidental. It is my opinion ... that accidental homicide is distinguished from culpable homicide by the absence of a culpable mental state."

transferred intent. See *Rodriquez v. State*, 548 S.W.2d 26, 28–29 [3] (Tex.Cr.App.1977). We must determine, apparently as a matter of first impression, whether criminally negligent homicide is a lesser included offense of the robbery species of felony murder in this case.

The parties argue more or less abstractly to support their respective positions. Appellant points out that "the culpable mental state for the act of felony murder is supplied by the mental state accompanying the alleged robbery which includes intentionally and knowingly placing the decedent in fear of imminent bodily injury and committing an act clearly dangerous to human life, i. e., the exhibit [sic] and use of a loaded shotgun." So, he asserts, that "if an individual intends to engage in certain conduct, he ought to be aware of a substantial and unjustifiable risk that an unintended result will occur if he places an individual in fear of imminent bodily injury and commits an act clearly dangerous to human life." For its part, the State sees "an act clearly dangerous to human life" and conduct amounting to criminal negligence as "distinctly different and unrelated facts." Particularly, the State says the distinguishing feature is "foreseeability," and elucidates:

"... In determining whether or not a person acts with criminal negligence the fact finder is asked to determine whether the actor ought to have been aware that under the circumstances his conduct posed a substantial and unjustifiable risk constituting a gross deviation from ordinary care. Stated another way, whether the actor should have known or foreseen the possible results of his conduct. No such inquiry is made by the fact finder in determining any of the elements of felony-murder. The essence of the felony-murder doctrine is that when an individu-

al is engaged in the commission of a felony, he is responsible for the results of his conduct as a matter of law, therefore, foreseeability is determined as a matter of law."

It seems to us that appellant comes closer to the mark, but still misses it. Our own academic view is that theoretically the kind of robbery felony murder alleged in this case may admit criminally negligent homicide as a lesser included offense.

Omitting the detailed averments of the offense of theft, what is alleged is a V.T. C.A. Penal Code, § 29.02(a)(2) mode of robbery; that is, that appellant "while in the course of committing theft and with intent to obtain property of Jerry Oliver ... did then and there *intentionally and knowingly* [4] place Jerry Oliver *in fear of imminent bodily injury* ..." As to the murder aspect, the indictment goes on to aver "while in the course of and furtherance of the commission of said offense, [appellant] did then and there *commit an act clearly dangerous to human life*, to-wit: exhibit and use a loaded shotgun against the person of Jerry Oliver in his habitation and did thereby cause the death of said individual." As the theory of transferred intent was generally understood to apply to felony murder cases under the former penal codes, whereas in the usual "regular" murder case, the trial court ordinarily instructed the jury that they must find the accused intended to kill the deceased, there were other kinds of cases in which it was not necessary to prove or charge the jury touching on a specific intent to kill "further than is involved in the proof of certain facts" such as a killing committed in the perpetration of arson, burglary or robbery, *Lyons v. State*, 138 Tex.Cr.R. 375, 136 S.W.2d 835 (1940), or other felony pursuant to Article 42,[5] P.C.

---

3. "... Thus, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying committed or attempted felony giving rise to the act. The transference of the mental element establishing criminal responsibility for the original act to the resulting act conforms to and preserves the traditional mens rea requirement of the crimi-

nal law. See, e. g., *Hilliard v. State*, 513 S.W.2d 28 (Tex.Cr.App.1974)."

4. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

5. Article 42 read:

1925, *Smith v. State*, 154 Tex.Cr.R. 234, 225 S.W.2d 846 (1949). In *Hilliard v. State*, 513 S.W.2d 28, 32–33 (Tex.Cr.App.1974), the office and operation of former Article 42, supra, is explained, *viz*:

"... We agree that the Legislature intended that there be distinct categories of homicide and assaultive offenses. Article 42, V.A.P.C., does not eliminate gradation of homicide; it adds another manner of showing murder; that is, murder committed while in the act of committing another felony.

\* \* \* \* \* \*

Appellant contends that by charging under Article 42 the court has deprived the jury of its right and duty to pass upon the necessary element of intent to kill. The exact point made in Article 42 is that if a felony is committed by accident or mistake while in the course of intentionally committing another felony, he is guilty of the felony actually committed. · Thus, the intent to kill in the present case is supplied by the intent to commit the felony which the appellant did intend to commit and was committing which caused the child's death. [Citing cases.]"

■ *Rodriquez v. State*, supra, at 29, demonstrates the verity of remarks in the Practice Commentary following V.T.C.A. Penal Code, § 19.02, wherein it is observed,

"One intending to commit a felony and who in the act of preparing for or executing the same shall through mistake or accident do another act which, if voluntarily done, would be a felony, shall receive the punishment affixed to the felony actually committed."

6. "Thus, a person may act 'unintentionally' and still commit a criminal offense, provided he acts with knowledge, recklessness, or negligence.

7. As *Garrett v. State*, 573 S.W.2d 543 (Tex.Cr.App.1978) explains, it is not permissible for the State "to use the very act which caused the homicide, committing an aggravated assault by use of a deadly weapon, as the felony which boosts the homicide itself into the murder category." .

"As most felony murder prosecutions today involve killings committed while the felon is engaged in highly dangerous conduct, however, Section 19.02(a)(3)'s restatement of the doctrine will probably effect little change in practice." Thus, in this way, as the *Rodriquez* Court concluded, "the traditional mens rea requirement of the criminal law" is preserved. Criminally negligent homicide being a potentially lesser included offense in the modes of murder denounced by § 19.02(a)(1) and (2), *Simpkins v. State*, supra, at 133; [6] *Branham v. State*, supra, and *Moore v. State*, supra, we hold that it is likewise a prospective lesser included offense of felony murder when the intended felony is other than an underlying assaultive offense.[7]

■ Factually, however, the issue of criminally negligent homicide is not raised, and appellant was not entitled to a charge on the issue for that reason. *Simpkins v. State*, supra. Appellant denied any intent to obtain marihuana from Oliver unlawfully, asserting instead that he "just wanted to collect my money." [8] He recounted that the earlier conversation about ripping off Oliver was just a joke, and even that discussion ceased before they reached the house because Chapman, himself in previous trouble for armed robbery, could not afford anymore. He admitted that Oliver could not have seen his approach to the house, but insisted he was "not trying to be sneaky." [9]

8. Chapman related a conversation with appellant as he sat in the car and appellant indicated he was going up to the Oliver house:

"I said, Donnie, I said, Donnie, don't take a gun up there. He says, Dwayne, I know what I'm doing. He owes me 40 bucks and I have got to get the money. Don't worry, I'm going to bring him outside and talk with him about it. He said, just stay here and make sure I'm okay."

9. On this point as with so many other movements and descriptions of persons and places, we are handicapped in drawing a clear understanding of things because a diagram with which the parties were working before the jury and exhibits such as photographs are simply not in the record before us. Once again the Court urges all affected parties and persons responsible for making a complete record as required to ensure that it is forwarded to the Clerk of this Court.

He admitted taking the loaded sawed-off shotgun into the house, but claimed it was because Oliver had pulled a gun on him before and was known for having guns and knives. He knew the shotgun could be discharged through hammer action alone,[10] and as he entered he was nervously "working" the hammer with his thumb "like this,"[11] but it was not cocked.[12] He denied pointing the shotgun at Oliver and told the jury it was brought into a position for the shot to strike Oliver when Oliver moved to protect himself by grabbing the shotgun. Precisely, appellant testified on cross examination:

"Q: At that time your thumb was on the hammer?

A: Yes, sir.

Q: What happened when he grabbed it?

A: It went off.

Q: Your thumb—are you saying that your thumb slipped off the hammer?

A: When he pulled—my thumb went off."

"This Court has consistently held that when the evidence from any source raises an issue that a lesser included offense may have been committed and that a jury charge on the issue is properly requested (or objection made to failure to charge), the issue must be submitted to the jury," *Orms-*

*by v. State*, 600 S.W.2d 782, 785 (Tex.Cr. App.1980), and many of the cases already cited and discussed *ante* show our adherence to the holding. But here, unlike *Branham, Moore, London* and the others, we believe from the evidence that the level of awareness in the mind of appellant concerning the risk surrounding his conduct or the results thereof as he approached and entered the home of Oliver was such that indeed he "perceive[d] the risk of harm which his conduct create[d]," *Moore v. State*, supra, at 123. Stated another way, there was not enough evidence to raise an issue of reasonable doubt whether he was acting other than intentionally or knowingly, so that the jury could have found that the appellant *ought* to have been, *but was not*, aware that his conduct would create a substantial and unjustifiable risk resulting in the death of the deceased, *id.* at 124. Appellant at no time expressly suggested he failed to perceive the obvious risk involved, nor does the testimony of any other witness, and directly to the point his friend and companion Chapman quotes him as saying, "I know what I'm doing . . . just stay here and make sure I'm okay." Appellant agreed that he was talking to Chapman while Garza went to see Oliver, but he never denied the awareness of risk attributed to him by Chapman.

10. Appellant had been to Campbell's house a few days earlier, and Campbell, really proud of it, was showing the shotgun to appellant; he offered to let appellant try it out. Although appellant testified he had never used the shotgun before, presumably he learned enough about it from Campbell to feel that he could use it, for as shall be shown he was versed in how to fire the shotgun.

11. Everyone in the courtroom may well have seen and appreciated the following demonstration, but obviously it is not made clear in the record:

"Q: Would you show me the manner in which you were holding the gun?

A: Yes, sir, I had it just like this.

Q: When you walked into that house you were holding it just like . . .

A: Yes, sir, I was walking up—like this and I grabbed the door and held it like this.

Q: Where was your finger, finger was like that?

A: Yes, sir.

Q: Was the thumb on the hammer?

A: Yes, sir.

Q: Did you pull the hammer back?

A: No, sir, I was just sitting there working it like this."

12. "Q: You cannot fire the weapon until you pull the hammer back?

A: No, sir, you can fire the weapon without doing that, pull it back.

 * * * * * *

Q: But, you have to pull the hammer back?

 * * * * * *

A: I do not have to lock it to make it fire, just snap it like that.

 * * * * * *

Q: You were working it back and forth?

A: Yes, sir, nervous.

Q: You knew very well that in order to fire this weapon you had to get that back?

A: Like I said, you can fire either way."

We simply cannot find any evidence that appellant was functioning merely with the requisite culpable mental state for negligent homicide. The thrust of appellant's defense, and such other evidence favorable to it, was to deny any voluntary or intentional act which would raise any of the several elements of the offense with which he was charged. The trial court did not err in failing to instruct the jury on the law of criminally negligent homicide. *Simpkins v. State*, supra. The first ground of error is overruled.

 Finally, appellant contends that inadmissible hearsay, admitted over his objection, tainted his conviction. From his brief we surmise that he refers to the following exchange that ensued after codefendant Garza had been recalled by his own attorney to clarify testimony he had given in response to questions by the district attorney "in which there may have been some confusion," *viz*:

"Did you ever have occasion to state that you *knew* that Donnie had a gun in his car when you went to Jerry Oliver's house, Don was going to rip him off . . .

MR. VANDERPOOL [Attorney for appellant]: Your Honor, I object to that as heresay [sic] as far as my client goes.

\* \* \* \* \* \*

THE COURT: Are you taking about the statements he made when he testified yesterday?

MR. VANDERPOOL: No, Your Honor.

THE COURT: I fail to see your point. I overrule your objection."

We observe that so far the question had not been answered. When it was, the answer was to the effect that Garza had made a statement that appellant said the gun was just in case he got into trouble, that he, appellant, said he was not going to use it. That was followed by the clarification that *Garza* in mentioning a gun had reference to the gun in the back seat that Chapman had brought into the car and that his statement was to indicate that he, Garza knew there was a gun in the car. On recross examination, Garza admitted to the district attorney that he was now testifying differently from what he had the day before when being questioned by the district attorney. Thus, as we gather from what occurred, while his own out-of-court statement was confirmed by Garza the purpose was not to show the truth of the matter stated, but to explain what he, Garza, knew about a gun being in the car. We perceive no error, and note again that when he testified appellant conceded that he "may have said that." The third ground of error is overruled.

The judgment is affirmed.