Jackie William **SHERWOOD**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–86–013–CR.

Court of Appeals of Texas, Fort Worth.

July 8, 1987.

Woodruff, Fostel, Wren & Simpson and Melton D. Cude, Decatur, for appellant.

Brock R. Smith, Dist. Atty., Decatur, for State.

Before FENDER, C.J., and BURDOCK, HOPKINS (Retired, Sitting by Assignment), JJ.

## OPINION

HOPKINS, Justice, (Retired, Sitting by Assignment).

Appellant, Jackie William Sherwood, appeals from a conviction by the jury for murder. *See* TEX.PENAL CODE ANN. sec. 19.02(a)(1) (Vernon 1974). Punishment, enhanced by one prior felony conviction, was assessed by the jury at fifty years confinement in the Texas Department of Corrections.

The judgment is affirmed.

On April 16, 1985, the body of the decedent, sixty-year-old Homer LaFate Minyard, was discovered in a rural area in Wise County. Appellant and two others, Johnnie Soule and Mima Jean Hodges, were indicted for Minyard's murder. Soule is appellant's mother. Hodges is appellant's aunt, Soule's sister, and the decedent's common-law wife. Appellant was indicted and convicted under the theory that he either acted alone, or as a party with Soule and Hodges. The cases against the three defendants were severed and tried separately.

In three points of error appellant challenges the sufficiency of the evidence, the trial court's action in admitting into evidence certain items not disclosed in pre-trial discovery, and the court's ruling allowing into evidence hearsay statements of co-defendant Hodges.

In his first point of error, appellant contends the trial court erred in failing to instruct the jury to return a verdict of not guilty because there was insufficient evi-

dence adduced as a matter of law to support the offense.

The State's theory of the case was basically that the day before the murder, appellant and his mother, Johnnie Soule, traveled to Wise County from Wyoming. After they drove to Fort Worth to pick up some personal belongings being stored there, they returned to Wise County where they purchased a .20 gauge shotgun with which they shot and killed the decedent on April 16, 1985, dumped his body in a rural area just south of Chico, Texas (Wise County), and towed the decedent's pickup truck back to Wyoming where they ultimately abandoned it.

Appellant's presentation of the case was based upon his claim that when he and his mother drove down from Wyoming, he understood the sole purpose of the trip was to pick up furniture in Fort Worth, and return with it to Wyoming. Appellant sought to make the jury believe that the decedent's wife contacted her sister, appellant's mother, and solicited her help in planning the murder of the decedent. The defense contended that until he was arrested, appellant knew nothing of the real purpose of the trip, and he participated in towing and abandoning the decedent's pickup truck only because his mother told him the vehicle was stolen and they needed to get rid of it.

Neither appellant, his mother (Johnnie Soule), nor the decedent's common law wife (Mima Jean Hodges), testified at trial.

In reviewing the sufficiency of the evidence,[1] we must view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. State*, 672 S.W.2d 801, 803 (Tex. Crim.App.1984); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984) (opinion on reh'g); *Wilson v. State*, 654 S.W.2d 465, 471–72 (Tex.Crim.App.1983) (opinion

on reh'g). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A conviction based upon circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the appellant. *See Johnson v. State*, 673 S.W.2d 190, 195 (Tex. Crim.App.1984); *Jackson*, 672 S.W.2d at 803. Stated conversely, if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding. *See Johnson*, 673 S.W.2d at 195; *Wilson*, 654 S.W.2d at 472.

Each party to an offense may be charged with a commission of the offense. TEX.PENAL CODE ANN. sec. 7.01(b) (Vernon 1974). A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or by both. TEX. PENAL CODE ANN. sec. 7.01(a) (Vernon 1974). A person is criminally responsible for the conduct of another if, inter alia:

> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; ....

TEX.PENAL CODE ANN. sec. 7.02(a)(2) (Vernon 1974). While presence by an individual at the scene of an offense is insufficient evidence to sustain a conviction, it is a circumstance tending to prove guilt, and, taken with other circumstances, may suffice to show that the accused was a participant. *Harris v. State*, 645 S.W.2d 447, 457–58 (Tex.Crim.App.1983). In making this determination, the jury can examine

---

1. The standard of review by the trial court regarding appellant's motion for instructed verdict, made after the close of all the evidence, is the same standard by which this court reviews sufficiency of the evidence. *See Kuykendall v. State*, 609 S.W.2d 791, 794 (Tex.Crim.App.1980)

(citing *Chase v. State*, 573 S.W.2d 247, 249 n. 1 (Tex.Crim.App.1978)); *Williams v. State*, 680 S.W.2d 570, 575 (Tex.App.—Corpus Christi 1984), *pet. ref'd per curiam*, 692 S.W.2d 100 (Tex.Crim.App.1985).

events before, during and after the commission of the offense, including actions which show an understanding and common design to do a certain act. *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim.App. 1986); *Harris,* 645 S.W.2d at 457–58.

Texas Ranger Phil Ryan testified that he received a telephone call on the afternoon of April 16, 1985 regarding a body that had been discovered in a rural area of Wise County, Texas. The decedent appeared to have been shot in the face. Ryan's preliminary investigation revealed that the identity of the decedent might be Homer ("Slim") Minyard who lived near Paradise, Texas, and who resided with Mima Jean Hodges. The witness telephoned Hodges who initially denied that she knew Minyard; however, upon further questioning Hodges acknowledged that she and Minyard lived together. Ranger Ryan went to Hodges' residence that evening and interviewed her, returning at daylight on the following day for a closer examination of the premises. This investigation uncovered a trail of blood on the grass outside the house, which someone had attempted to conceal with dirt and debris. In the yard, the officers also found a tooth, a part of a shotgun wadding, and a gray button, which later proved to be the same type as the decedent's.

After the body was found, Ranger Ryan teletyped a description of the decedent's green and white Chevrolet camper throughout the country. Two days later, on April 18, 1985, that vehicle was found in a ravine in Carbon County, Wyoming. The Wyoming deputy sheriff investigating the incident testified it appeared someone had driven the vehicle off the road in this rural area. The vehicle was subsequently towed into town and examined by the investigators; the evidence removed from the vehicle was sent to the Wise County investigators.

Ranger Ryan stated his opinion that the shooting took place at about 2:00 o'clock p.m. on April 16, 1985, and that the decedent was not killed at the location where his body was found, as evidenced by the absence of a great amount of blood at the scene. Ranger Ryan's testimony was that the decedent was killed at his house, dragged to his vehicle, and his body was later dumped in the rural area where it was found. A comparison of tire tracks found at the scene where the body was dumped, with the tires of appellant's truck, revealed the two sets of tracks were "similar." Ranger Ryan acknowledged that there were no witnesses either to the shooting or to the dumping of the body.

The medical examiner testified there was an abundance of blood around the face and the interior part of the decedent's body. The decedent had received a shotgun wound in his right cheek from a distance of six to ten feet, and the cause of death was asphyxiation due to massive aspiration of hemorrhagic material, resulting from a shotgun injury of the right cheek. The witness was unable to determine if the wound had been caused by a .12 gauge, a .20 gauge, or a .410 gauge shotgun. The medical examiner stated the decedent died within approximately five to ten minutes of receiving the wound, and he had a .08% level of alcohol in his blood at the time of his death.

Susan Taylor, a serologist for the police department, testified she received various items from the investigators in the instant case, and examined each for the presence of possible body fluid, such as blood. She stated the decedent had type O blood, which was also found on: the shirt he was wearing; a handi-wipe recovered from his pickup truck; dirt and rocks outside his home; a blouse located in his pickup; and the tailgate, seats, and carpet of his vehicle. Additionally, although State's Exhibit 35, a .20 gauge shotgun, did not have any fingerprints on it, Taylor removed a reddish substance from the gun and determined it was type O blood. The witness indicated that none of the items submitted to her contained any blood that was inconsistent with that of the decedent's blood type.

Lloyd Courtney, a fingerprint expert, testified the fingerprints taken from the hood of the decedent's vehicle are those of appellant, and those taken from the inside window on the passenger's side of the same

vehicle belong to Johnnie Soule. None of the latent prints matched those of Mima Jean Hodges. Courtney stated that while there is a possibility of one hundred points of identification in the comparison of fingerprints, an expert needs only seven points to be assured a latent print and a known print are one and the same. The latent prints in the instant case taken from the decedent's vehicle, and the known fingerprints of appellant, showed thirteen points of identification.

The decedent's sister, Bertha Sisk, testified she saw her brother between 10:00—11:00 o'clock a.m. on April 16, 1985, when he came by her home in Forth Worth. At that time the decedent was driving his 1974 green and white Chevrolet camper truck, and stayed approximately 30 minutes. She stated that he lived in Wise County with Mima Jean Hodges, with whom he had a common-law marriage.

In presenting their other witnesses, the State attempted to show that on April 15, 1985 appellant and his mother drove their blue and white pickup from Wyoming to Wichita Falls, Texas, proceeding on to Paradise, Texas; the two then traveled to Fort Worth, returning again to Paradise and Wichita Falls on April 16th.

JoAnne Bachman testified that appellant's mother, Johnnie Soule, had been her sister-in-law at one time (they were married to brothers); however, she had not seen Johnnie in fifteen years. Bachman lives fifteen miles outside of Wichita Falls, Texas, and on the morning of April 15, 1985 she received a telephone call from Johnnie saying she and appellant were in the area. They then came by Bachman's house around 7:30 o'clock a.m., and told her they were traveling from Wyoming and their destinations were Fort Worth and Mima Jean Hodges' house in Paradise. They were driving a blue Ford pickup and left around 10:00 o'clock a.m. that morning.

Linda Greeson testified she lives in Paradise, Texas and works at Bridgeport Elementary School in the cafeteria, where Hodges is the manager. On April 15, 1985, between 10:45 and 11:00 o'clock a.m., she observed two people in the cafeteria, one of whom she presumed to be Hodges' sister since Hodges was expecting her. These people drove a blue two-tone pickup truck and Hodges talked with them when she wasn't serving food.

Greeson stated that these same two individuals returned the next morning, April 16th, and were in Hodges' office talking with her. The witness noted that on the second visit the blue pickup had furniture and other items loaded in the back, which were covered with a quilt or blanket. These two visitors had departed by 8:30 o'clock a.m.

Odaline Etheridge testified that she lives in Fort Worth and has known Johnnie Soule since she was sixteen, and appellant since he was two years old. She mentioned that she is a very good, personal friend to the two individuals, and they call her "mom" and "granny." The witness stated that she had in her possession everything Johnnie owned (clothing, furniture, dishes, bed clothes, suitcases), and was storing the items for her. She had no idea where Johnnie was living until Johnnie and appellant came by her house on April 15, 1985, having contacted her by telephone the previous Saturday. Johnnie indicated she was "coming after her things," and she and appellant arrived on the 15th at 4:00 o'clock p.m. in a new blue and white pickup truck. They said they had been at Hodges' in Paradise, and they loaded Johnnie's belongings into the truck, leaving at 7:00 o'clock p.m. on the evening of the 15th.

Jeff Hutchinson testified that he manages a gun store in Boyd, Texas and on April 16, 1985 he sold a model 88, .20 gauge shotgun to Mrs. Johnnie Michelle McLaren of Chico, Texas. (The record reflects that McLaren was a name previously used by Johnnie Soule.) At the time of the purchase there was a man with her who stated "[t]his is a good gun." This shotgun, State's Exhibit 35, was later recovered from the house where appellant and his mother live with George Soule.

JoAnne Bachman's testimony continued with her recitation that appellant and Johnnie Soule returned to Wichita Falls at approximately 4:00 o'clock p.m. on April 16th

at which time appellant was driving his blue pickup, and Johnnie was driving a two-tone green Chevrolet pickup with a white camper. The witness indicated that appellant and his mother proceeded to transfer items from the blue pickup to the green camper. She stated that when she noticed blood on the tailgate of the green camper and asked Johnnie what the blood was, Johnnie replied that the people to whom she had loaned her pickup had gone deer hunting over the weekend and had killed a deer and put it into the back. Johnnie told appellant to clean the mess off the tailgate, whereupon Bachman gave appellant a rag, which was one of her daughter's old blouses. Bachman testified that at that time there was a .20 gauge shotgun laying in the green pickup.

Bonnie Todd testified that she lives in Rawlins, Wyoming and knows appellant and his mother, Johnnie Soule. She stated that she didn't know the exact date, but on a Thursday morning about 7:30 o'clock a.m., at Johnnie's request she went over to Johnnie's house and helped Johnnie and appellant unload a green and white Chevrolet pickup truck. After they unloaded, Johnnie decided to get rid of the green and white truck, whereupon the witness and appellant left in the two trucks. Appellant was driving the green and white Chevrolet pickup, and Todd was following him in the blue pickup; they eventually stopped the vehicles in a hilly rural area, and appellant left the Chevy pickup and drove back with the witness. On the return ride appellant told Todd that he was "the one that pulled the gun and shot the man," and stated that the shot was in the jaw.

The first defense witness was Loretta Tolliver, who stated that she and Johnnie Soule were in adjoining open cells in the Wise County jail for the first two weeks in May, 1985. During that period of time, Johnnie allegedly made numerous statements to her concerning this incident. Specifically, Johnnie said that she was waiting in the house with the gun when this man drove up in a pickup—Tolliver said Johnnie never told her his name. Johnnie was standing at the back door, and when the man got out of the truck she shot him.

The witness related that Johnnie talked about how heavy the man was, that she loaded him into a truck that had a camper on it, and took the body and dumped it at the Chico Cemetery. Johnnie told her that she then left and met her son and they loaded up their things, and when her son mentioned to her about the blood being in the truck, she told him it was deer blood. Tolliver stated Johnnie told her that when they returned to Wyoming, Johnnie called her son and told him the truck had been stolen and to get rid of it.

Tolliver testified that when she was in the Wise County jail, she wrote a note to the Sheriff asking to be a trustee, and telling the Sheriff she knew something about this murder, and that she wanted to talk to him; however, he never responded. The State later established that Johnnie Soule and Loretta Tolliver were not in the Wise County jail together for two weeks, as testified to by Tolliver, but merely for a total of four days, May 2–6, 1985.

The last witness for the defense was Glenda Brewer who lives in Rawlins, Wyoming. Appellant is her brother, and Johnnie Soule is her mother. She testified that a few weeks prior to Johnnie's trip to Fort Worth in April of 1985, Johnnie telephoned her and stated that she had some business to take care of in Bridgeport, and inquired whether her daughter had a gun she could borrow. Brewer responded that she did not have a gun. About one and one-half months before the trial of the instant case, Johnnie called her and requested that they meet for coffee. At that meeting Johnnie said "[y]ou should have seen the SOB's face whenever I squeezed the trigger and blew his head off." Brewer asked Johnnie where appellant had been and Johnnie said "[w]ell, he was out galavanting [sic] around as usual." Brewer testified that although she attempted to contact Ranger Ryan to convey this information to him, he never returned her telephone messages.

On cross-examination, Brewer acknowledged that she and Johnnie had been in a child custody hassle over the witness's daughter since the birth of the child. Additionally, the State recalled Ranger Ryan

who stated that although he initially interviewed Glenda Brewer and received one follow-up telephone call from her, he denied receiving any further telephone messages from her.

■ After a comprehensive review of all the evidence in this case, we find the circumstances exclude every other reasonable hypothesis except that of the guilt of the appellant, and the jury could have found the essential elements of murder, as charged in the indictment, beyond a reasonable doubt. Accordingly, we hold the trial court did not err in failing to instruct the jury to return a verdict of not guilty, and we overrule appellant's first point of error.

In his second point of error, appellant contends the trial court erred "by admitting into evidence items and documents not disclosed to appellant prior to trial despite the motion for discovery granted by the trial court on such items."

On June 25, 1985, the trial court held a hearing on appellant's discovery motion and granted most of appellant's discovery requests. The State subsequently filed several written answers to the discovery motion, and on September 27, 1985 another hearing was held regarding the State's compliance with the trial court's prior discovery order. At this hearing, additional information was furnished by the State to appellant. The trial in the instant case began October 7, 1985.

Appellant asserts the following evidence should have been excluded at trial, either because appellant was denied discovery, or was not timely provided with these items:

1) The fingerprint testimony;

2) The statement against interest made by appellant to Bonnie Todd;

3) The search warrant authorizing a search of the decedent's vehicle, and all evidence found as a result thereof;

4) The arrest warrant for appellant;

5) The two written consent search warrants executed by George Soule for his residence, and the .20 gauge shotgun (State's Exhibit 35) recovered in the search; and

6) The cast of a tire from appellant's pickup (State's Exhibit 30).

With regard to item 1 (fingerprint testimony), the record reflects that on August 23, 1985 the State provided appellant with two reports by Lloyd Courtney which indicated that the latent print taken from the hood of the decedent's vehicle was that of appellant, and the print taken from the inside passenger window of the same vehicle belonged to Johnnie Soule.

Item 2 (Todd's testimony), item 3 (search warrant for decedent's vehicle), and item 4 (arrest warrant for appellant) was furnished to appellant at the September 27, 1985 hearing.

Item 5, the consent to search forms signed by George Soule, were furnished by the State to appellant on October 8, 1985, with an explanation from the prosecutor that he had not received these items until that morning. On appeal, appellant urges that the .20 gauge shotgun should have been suppressed because of the State's belated compliance with the discovery order regarding the consent to search forms.

Lastly, item 6 was State's Exhibit 30 which consisted of a plastic impression of the left rear tire of appellant's vehicle, taken by Ranger Ryan. Appellant objected at trial that the State had not informed him about the existence of such a casting, or about the results of the comparison of the tracks at the scene where the body was recovered with those in State's Exhibit 30. Appellant specifically urges the State violated the trial court's pre-trial order which granted discovery of "[a]ll physical evidence intended to be offered into evidence," and "[t]he results of any tests, scientific or otherwise, made by the State or its discretion, on any evidence gathered by the State or any law enforcement agency." The State's response was that in its written answer to appellant's discovery motion, it had indicated "[t]he State will make available all physical evidence for the defendant's attorney's viewing at their [sic] convenience ...," and had defense counsel availed himself of this offer, he would have been aware of the existence of the casting and could have examined it. Defense coun-

sel was permitted to view the exhibit prior to it being shown to the jury.

■ Although the question of what is discoverable under TEX.CODE CRIM. PROC.ANN. art. 39.14 (Vernon 1979) is totally discretionary with the trial court, *Dickens v. Court of Appeals*, 727 S.W.2d 542 (Tex.Crim.App., 1987), and *Quinones v. State*, 592 S.W.2d 933, 940 (Tex.Crim.App. 1980), *cert. denied*, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1982), once the trial court grants a motion for discovery and the prosecution fails to disclose that evidence ordered by the trial court, the undisclosed evidence should not be admitted at trial. *Lindley v. State*, 635 S.W.2d 541, 543 (Tex. Crim.App.1982); *Hollowell v. State*, 571 S.W.2d 179, 180 (Tex.Crim.App.1978). However, the prosecution's failure to comply with a discovery order may constitute harmless error. *Hollowell*, 571 S.W.2d at 180.

■ In the case at bar, it is evident that item 1 was timely provided by the State to appellant, and items 2, 3 and 4 were supplied at the pre-trial hearing of September 27, 1985. Therefore, we find the trial court did not err in allowing items 1 through 4 into evidence.

Regarding item 5, the consent to search forms and the shotgun, although the State belatedly complied with the trial court's pre-trial order requiring production of these consent forms, defense counsel was aware of the existence of these forms, and of the fact that the search had uncovered the .20 gauge shotgun. We find that the trial court's discovery order pertaining to item 5 was not violated, and the court did not err in admitting these items into evidence.

■ Finally, concerning item 6, the cast of the tire from appellant's vehicle, we find the State did not comply with the court's discovery order in that appellant was not informed that such a casting or comparison analysis existed. While we do not condone such actions, we find beyond a reasonable doubt that the error in admitting into evidence this exhibit, and the related testimony of Ranger Ryan, made no contribution to the conviction or to the punishment assessed. *See* TEX.R.APP.P. 81(b)(2). Ranger Ryan merely testified that the pattern of the tire design in this exhibit "was similar to the one that was at the scene." As noted by appellant in his brief, the witness acknowledged there was nothing remarkable about appellant's brand of vehicle and its type of tires. Accordingly, we hold the error was harmless, and we overrule appellant's second point of error.

In his third point of error, appellant urges the trial court erred in admitting into evidence two statements made by Mima Jean Hodges to Ranger Ryan. When the State was questioning Ranger Ryan about his initial investigation in determining the identity of the decedent, the following dialogue transpired:

Q. All right. Evidently, you were able to get her [Hodges] on the telephone?

A. Yes. Yes.

Q. All right. Describe what happened?

A. Upon asking her did—did she know Slim Minyard, she said, no, and gave no other information. And it confused me, so I told her that I was referred to her by Bertha Sisk who give [sic] me her name and phone number.

And that this Bertha Sisk had indicated to me that Slim Minyard was living with her.

Q. *Okay. When you gave her this information, how did she react?*

A. She said—

[DEFENSE COUNSEL]: Your Honor, I will object to anything further of what this lady told him as hearsay.

THE COURT: Overrule your objection.

QUESTIONS BY [PROSECUTOR]:

Q. You may answer it, Ranger?

A. She said, "Oh, yeah, yeah, he does, but I haven't seen him." I said—I asked when was the last time that she had seen him, and she said, "6:00 o'clock this morning. He was in bed when I left for work."

Q. All right. When you first got her on the telephone and you asked about Slim Minyard, her reply was, what, now? [Defense counsel voiced his objection, the State responded that the objected-to statements would be part of the res gestae of the offense and admissible as a statement of a co-conspirator, and the court overruled the objection.]

QUESTIONS BY [PROSECUTOR]:

Q. *When you first contacted her by telephone and you asked about Slim Minyard, what was her reaction?*

A. I asked her if she knew Slim. She said—she advised she did not.

Q. All right. Ranger Ryan, did you have an occasion to actually go and meet this person that you talked to by telephone?

A. Yes, I did.

Q. All right. Describe that to the jury.

A. Okay. After talking a little further on the phone with her I told her that we would be right out.

. . . .

[BY PROSECUTOR]:

Q. All right. Describe what happened when you returned to the home?

A. We were sitting out back where we had parked earlier and Jean came out. And she was—she was up, and we told her that we felt like that the time dictated the fact that—that we needed to look around a little closer there to see if something had taken place at the residence, and that we needed to wait until daylight to conduct a more thorough search of the grounds.

Q. *All right. How did she react to this?*

A. I—

[Objection and discussion outside the presence of the jury, whereupon proceedings continued as follows:]

QUESTIONS BY [PROSECUTOR]:

Q. Ranger Ryan, I believe you were testifying about being inside of the house, telling Mrs. Hodges that you were back to make further investigation; am I correct?

A. That's correct.

Q. *Could you tell us how she responded to that?*

A. She said that during the night she was awakened by a noise and she went outside. And she had seen some dirt that was up in the yard that hadn't been in the yard before.

And that—Using her terminology that, "Slim was not a yard man," which I took to mean he did not work in the yard that much.

She didn't know how it got there. [Emphasis added.]

◼ Appellant complains about the answers to the questions emphasized above, claiming the responses were inadmissible hearsay which do not fit within any exception to the hearsay rule. With regard to Ranger Ryan testifying that Hodges first denied knowing the decedent, we note this same testimony was admitted earlier in the quoted dialogue, without objection from appellant. Therefore, the evidence was already before the jury, and any alleged error is waived. *See Brown v. State*, 640 S.W.2d 275, 280 (Tex.Crim.App.1982).

Concerning Hodges' response when Ranger Ryan persisted with his inquiries about whether the decedent lived with Hodges, and the statement by Hodges to Ranger Ryan informing him about the pile of dirt outside the residence, the State contends these statements were admissible against appellant under the co-conspirator exception to the hearsay rule since Hodges was a co-defendant, and appellant was alleged in the indictment to be guilty acting as a party with Hodges. Appellant asserts this case is governed by the holding in *Ward v. State*, 657 S.W.2d 133 (Tex.Crim. App.1983) wherein the court stated the general rule that an act or statement of one co-conspirator after the completion of the conspiracy, is inadmissible against the accused. *See id.* at 137. The State counters that the conspiracy in the instant case did not end with the murder of Homer Minyard, but continued during the attempt to conceal its commission, citing *Denney v. State*, 558 S.W.2d 467 (Tex.Crim.App.1977),

cert. denied, 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978).

 In order for the statements of Hodges, the alleged co-conspirator, to be introduced into evidence, the State had the burden of establishing as a predicate that a conspiracy existed. See Ward, 657 S.W.2d at 136. Specifically, the State had to prove: 1) at the time the statements were made by Hodges, she was participating in a conspiracy in which appellant also participated; and 2) the statements were made during the furtherance of the conspiracy. Id. at 136–37. This co-conspirator exception to the hearsay rule is not limited to prosecutions for conspiracy; it is a rule of evidence applicable to any offense. See Roy v. State, 608 S.W.2d 645, 651 (Tex.Crim.App. 1980).

The fact of a conspiracy must be proven by evidence outside of and independent of the statements which tend to establish the joint act of the parties. Denney, 558 S.W.2d at 469. Appellant contends the State did not prove the second prong of Ward because the conspiracy had already terminated at the time Hodges made the complained of statements. We disagree. "A conspiracy is not terminated until everything has been done that was contemplated to be done by the conspirators." Bates v. State, 587 S.W.2d 121, 132 (Tex. Crim.App.1979). The record in the case at bar clearly establishes that the conspiracy did not terminate upon the completion of the offense of murder, but continued until all incriminating evidence (decedent's truck, blood on the ground outside Hodges' house, the .20 gauge shotgun) had been concealed. We find that the statements made by Hodges were made in a repeated effort by her to perpetuate a cover-up of the murder, and the statements were made in furtherance of the conspiracy.

Accordingly, we hold the State met its burden of proof and the trial court did not err in allowing Ranger Ryan to testify regarding Hodges' statements. Point of error three is overruled.

The judgment of the trial court is affirmed.