**David Albert DOWLER, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 08–88–00032–CR.**

Court of Appeals of Texas,
El Paso.

Aug. 23, 1989.

Rehearing Denied Oct. 4, 1989.

**446**

H. Thomas Hirsch, H. Thomas Hirsch, P.C., Odessa, for appellant.

Gary Garrison, Dist. Atty., Odessa, for appellee.

Before FULLER, WOODARD and KOEHLER, JJ.

## OPINION

WOODARD, Justice.

This is an appeal from a judgment of conviction for murder in which the jury assessed a life sentence in the penitentiary. We affirm.

On the 28th day of June, 1987, the body of a school teacher in her late twenties was found in the middle of her bed on her back in a posture of quiet repose. Her two-year-old daughter was found nearby, alive and naked but for a helter-skelter coating of nail polish and makeup. Except for disarray characteristic of a toddler, the area was neat and orderly with no signs of violence. Although the victim had a blood/alcohol level of .19 per cent, no alcohol or other evidence of use thereof was found in the home. Subsequent investigation determined her death was by chloroform.

Points of Error Nos. One, Two and Three are directed to the trial court admitting evidence of two extraneous offenses.

The victim was discovered by her friend, Kerri Middleton. She had received a telephone call from the Appellant who stated he had a premonition of harm to the victim and asked Kerri to investigate its validity. After several attempts to telephone the victim, Kerri's calls finally were answered by the two-year-old daughter. The child told Kerri that her mother would not wake up. Though Kerri requested the Appellant to accompany her to the victim's house, he repeatedly declined, stating that it might not look right if he showed up there.

A tangled web of facts created suspicion toward the Appellant by Kerri and the police. Appellant had requested to talk to Kerri about the precursory deaths of their two mutual friends. She met with him on three different occasions while equipped with a secret recording device which was monitored by the police. The some nine and one-half hours of conversation, most of which consisted of chatter and prattle by the Appellant, explored the consecutive deaths of three people whose lives had been intertwined with the Appellant's and two of which had been friends of Kerri. The Appellant announced his theory of the incidents to be serial murders, denominating the identity and methods of their respective killer. He hypothesized a bizarre method of dispatch by Kyle, his depicted killer. Kyle was to have splashed his victims upon their chests with a mixture of cyanide and a catalytic vaporizor, causing the victims to breath the fumes and suffer an instant death. He derided the police department's ability to discover and apprehend Kyle. He suggested a clever tactic that the police should pursue would be to find a woman that Kyle would trust and have her elicit incriminating information from Kyle while she was wearing a concealed transmitter. The Appellant predicted that he and Kerri would be the next victims, and that they must strike first in self-defense. He proposed a "cyanide splash" execution of Kyle with Kerri being the "lookout."

The victims had been believed to have died from natural causes. Based upon the Appellant's discourse, the still preserved tissue and fluid samples of the first two victims were re-examined, and they displayed massive doses of cyanide.

A search of the Appellant's residence disclosed the presence of chloroform, chemicals and lab equipment bearing traces of cyanide.

The Appellant then gave a statement to the authorities that the deceased in this case had requested him to provide chloroform for her as a facilitator to induce hypnosis. The hypnosis was to be employed to resolve some of her "problems that she was having." Reportedly, he was to ask her certain questions she had written down after she was under hypnosis. He related she administered the chloroform to herself with a rag and then stated she wanted to sleep. He then assumed that she had changed her mind about the hypnotic process, so he took the chloroform and the rag from her hand and departed. Medical testimony refuted this happening by proclaiming the impossibility of the victim, in the sitting position described, being able to hold the administering rag to her mouth from a chloroform absorption point producing unconsciousness to that which produced death. He had previously told police he had not seen the deceased on the day of her death or the few days prior thereto.

■ During the trial, the entirety of the tapes were introduced. It is an established general rule of evidence that proof of similar happenings, extraneous transactions or prior specific acts of misconduct committed by a party is irrelevant to the contested material issues in the case on trial and therefore inadmissible. Extraneous transactions constituting offenses shown to have been committed by the accused may become admissible upon a showing by the prosecution both that the transaction is relevant to a (contested) material issue in the case (and that) the relevancy value of the evidence outweighs its inflammatory or prejudicial potential. *Collazo v. State*, 623 S.W.2d 647 (Tex.Crim.App.1981). If the State can prove that there are sufficient common distinguishing characteristics between the extraneous offense and the primary offense such that the probative value of the evidence outweighs its prejudicial value, then the court may admit the evidence to prove certain elements of the crime. *Plante v. State*, 692 S.W.2d 487 (Tex.Crim.App.1985).

■ The Appellant admitted to supplying the chloroform, but denied administering it. The identity of the person who dispensed the poison was in issue, as well as the intent of the administration.

On August 16, 1983, Appellant called Leo Blythe and requested him to check on his daughter, Lisa Blythe Krieg. Lisa was found on the bed of her apartment, draped in a sweat shirt only. No signs of violence were present.

On February 12, 1986, Appellant requested Leza (the victim in this case) to have her then husband, Kyle Chandler (who Appellant theorized to be the serial killer), check on Tony Casillas. Tony was the first husband of Leza and the business partner of the Appellant. Tony was found dead, face down on the floor of his residence, with no signs of violence except that a light globe had fallen and shattered upon the dining room table. Approximately two weeks before, Appellant called a young female acquaintance and asked her to read to him the formula for prussic acid out of a book he had loaned her. Prussic acid is chemically related to cyanide. The title of the book was *The Poor Man's James Bond*. He retrieved the book some eight days before Tony's death. After Tony's death, he told this witness conflicting stories, i.e., Tony was mixing cyanide and breathed it, and also that Kyle killed him. There was evidence of business problems between Tony and the Appellant at that time.

Appellant had claimed to Kerri to have had the intuitive ability to forecast calamity in these cases. He accredited their deaths to cyanide and admitted to Kyle that he had supplied cyanide to Lisa for her self dosage. He had been a counselor to the problems of and strongly influential in the lives of all the victims. There was evidence that Appellant was having affairs with both of the young women. All deaths were due to toxic poisoning. Although chloroform was the poison used in the death of the victim in this case (Leza), she had been poisoned by cyanide some months before. The Appellant had given her a pill that he represented to be an antidote to poison he claimed Kyle had given her. She became retchedly ill after she took the "antidote" pill.

The Appellant had represented himself to be a secret government agent, with implausible and even preposterous tales of murder and shadowy intrigue. He represented to Lisa, Leza and Kerri that their lives, as well as his, were constantly in danger from the acts of others. Lisa and Leza had been encouraged to take anti-venom to build resistance to prophetized poisoning. His indictment of Kyle as the common killer was faulted by evidence that Kyle and Lisa were never acquainted, however. All the victims met death in their residences which were located in the same general area. Appellant had known all victims through business associations.

Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence, it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable. *Plante v. State*, 692 S.W.2d 487 (Tex.Crim.App.1985). The Appellant's interest, knowledge and prior usage of chemical poison is relevant because it tends to make his dispensing of chloroform more probable. Evidence of his prior solutions to his relationship problems by homicide is also relevant. They do not show the Appellant's propensity to commit crimes in general, but show a propensity to commit a particular crime, for a similar reason, in a particular manner.

The material issues involved are identity and intent. The extraneous offenses of murder as well as the conspiracy to murder Kyle all involve a modus operandi peculiar to the Appellant. The offenses are somewhat remote in time and dissimilar in small detail, but not to a point where they become irrelevant or lack probative value.

The probative value of the evidence outweighs its inflammatory aspects. It is not a case of the tail wagging the dog. The extraneous matters are no more nor less heinous nor shocking than the one the Appellant was on trial for. Points of Error Nos. One, Two and Three are overruled.

■ Appellant contends error in the trial judge's refusal to quash the indictment. The case was originally indicted on one number in September of 1987. It was then reindicted under another number in December of that year. On January 4, 1988, in a pre-trial conference, attorney for the Appellant informed the trial court that a Motion to Quash the Indictment would be filed. On January 8, 1988, the Motion to Quash the Indictment was filed under the old number. On January 11, 1988, the trial commenced with the selection of the jury. Subsequent to jury voir dire, the Appellant requested the trial court for a ruling on his motion to quash and was duly overruled. Another similar Motion to Quash was filed the next day. Tex.Code Crim.Pro.Ann. art. 1.14(b) (Vernon Supp.1989) provides that a defendant waives any defect in an indictment unless he objects thereto before the date the trial on the merits commences. Tex.R.App.P. 52(a) provides that a defendant must present a timely objection and obtain a ruling to preserve a complaint for appellate review. The requirement of presentment means more than mere filing. It requires the movant to make the trial judge aware of the presence of the objection by calling the judge's attention to the motion in open court, or by some direct communication of record. The Appellant's pre-trial reference to his future filing of the motion gave the judge some notice and even generally related the nature of the objection that was going to be made. But this was not a presentation with an accompanying request (tacit or otherwise) for a ruling. Even if the mere filing of the written motion with the district clerk was considered constructive notice, the first motion filed before trial was filed under a different number than the case on trial before the judge. The Appellant's objections were untimely. Point of Error No. Four is overruled.

■ Appellant next objects to the admission of the diary of the deceased into evidence. His objection in the trial court was on the grounds of relevancy. He attempts to expand those grounds in his point of error. The Appellant is limited to the grounds he presented to the trial court. Tex.R.App.P. 52(a). It is contended the

diary is not relevant because its recording dates are from February, 1986 through May, 1986. The victim died in June, 1987. The diary details her affair with the Appellant, her desire to have his baby, and her frustration with his failure to leave his wife and come to her. He had denied having an affair with the deceased. It is not improbable that the situation progressed. The evidence supplies a possible motive for the slaying and makes his guilt more probable than it would have been without the evidence. Tex.R.Crim.Evid. 401. Tex.Penal Code Ann. sec. 19.06 (Vernon 1989) provides for the admission of all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased. Point of Error No. Five is overruled.

▌Point of Error No. Six asserts the trial court erred in admitting certain evidence seized under a search warrant that was based on a defective affidavit. It is firstly alleged to be defective in that the description of property to be seized is too global. The affidavit stated that the items concealed were Chloroform, contained in a bottle so labeled and with the brand name "Mallinckrodt", Methanol, Carbon Tetrachloride, Acid, Potassium Nitrate, Sulfuric Acid, Potassium Chlorate and other chemicals which may be used singly or compounded to cause the death of an individual. The (other chemicals) portion would permit a general exploratory search which is constitutionally prohibited. However, no other chemicals were introduced into evidence. The invalid portion would not render the remainder defective as the items are severable under the facts of this case. It was not so general in character except to minor items to raise an inference of a sham to gather wholesale seizures. *Walthall v. State*, 594 S.W.2d 74 (Tex.Crim.App.1980). The Appellant further attacks the sufficiency of the affidavit by maintaining there is no time stated relative to the facts alleged and the issuance of the search warrant. Probable cause to issue a search warrant exists when the facts submitted to the magistrate are sufficient to justify a conclusion that the property that is on the premises to be searched at the time the

warrant issues. *Gish v. State*, 606 S.W.2d 883, 886 (Tex.Crim.App.1980). In order to support the issuance of a search warrant, the affidavit must show that the act or event upon which probable cause is based occurred within a reasonable time prior to the making of the affidavit. *Gonzales v. State*, 577 S.W.2d 226 (Tex.Crim.App.1979). The affidavit in this case stated that Kerri Middleton informed affiant that the Appellant possessed chloroform, contained in bottles so labeled as chloroform, on the premises from January, 1986, to the present time. The date of the affidavit and search warrant were August 20, 1987. Kerri stated that the victim had informed her that she had discussed the ingestion of chloroform with the Appellant as recent as the week of her death on the 28th day of June, 1987. The affidavit goes on to state the Appellant admitted the discussion with the deceased about the use of chloroform in his statements made under the electronic surveillance. Jill Snyder informed affiant that the Appellant had possessed and used chloroform since 1986. A "totality of the circumstances" test applies to a search warrant's affidavit's statement of probable cause. *Eisenhauer v. State*, 678 S.W.2d 947, 952–53 (Tex.Crim.App.1984). Chloroform is not a contraband. It is not an item that would be ordinarily possessed in a temporary or desultory manner to avoid its detection. From the four corners of the affidavit, the totality of the circumstances would provide the magistrate with a substantial basis to reasonably conclude that the premises possessed the chemical at the time of the search warrant.

As a further part of this point of error, Appellant objects to a search warrant authorizing the seizure of the chemicals listed besides that of chloroform. He acknowledges that he offered the list of chemicals seized into evidence himself but seems to attempt to invoke exceptions to the doctrine of curative admissibility. He makes references to facts and objections without identifying their whereabouts in the record. He does not brief the matter nor cite authority. Hence, nothing is presented for review. *McWherter v. State*, 607 S.W.2d

531 (Tex.Crim.App.1980). Point of Error No. Six is overruled.

Point of Error No. Seven objects to the admission into evidence of a chemistry burner stand and two rubber stoppers. He contends they were seized without being listed on the search warrant and therefore inadmissible. In entering the Appellant's residence, police officers were armed with a search warrant for certain chemicals and with the knowledge that the Appellant may have taken the lives of others with chemicals. With the warrant, (1) they had justification for the intrusion, (2) they made an inadvertent discovery of equipment used for the mixing and storing of chemicals, and (3) they had probable cause to believe that there was a nexus between those items seized and the crimes they were investigating. *Brown v. State*, 657 S.W.2d 797 (Tex.Crim.App.1983); *Marquez v. State*, 725 S.W.2d 217, 243 (Tex.Crim.App. 1987). Point of Error No. Seven is overruled.

Point of Error No. Eight argues that the secret recording of the Appellant's conversations with Kerri Middleton were violations of his rights under the Fifth Amendment of the United States Constitution, as condemned in *McCrory v. State*, 643 S.W.2d 725 (Tex.Crim.App.1982). In the case at hand, the Appellant was not in custody nor deprived of his freedom of action in any way at the times of his statements. Point of Error No. Eight is overruled.

In his last point of error, Appellant urges error in the trial court's failure to grant his Motion for Instructed Verdict on the grounds of insufficiency of evidence after the State had rested its case and before presenting his defense. By presenting his defense, the Appellant waived this contention. *Kuykendall v. State*, 609 S.W.2d 791 (Tex.Crim.App.1980). Point of Error No. Nine is overruled.

Judgment of the trial court is affirmed.