COURT
OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-055-CR
 
CARLIS JOVONITE RUSSELL                                                          APPELLANT
V.
THE STATE OF TEXAS                                                              
    
STATE
------------
FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY
------------
OPINION
------------
I. Introduction
A jury convicted Appellant Carlis Jovonite
Russell of capital murder and assessed his punishment at life imprisonment. The
primary issue we address in this appeal is whether the trial court abused its
discretion by admitting testimony and detailed evidence regarding an extraneous
offense, the Vogt Street offense, during the State's case-in-chief. The Vogt
Street offense was arguably relevant to prove intent, but its prejudicial effect
greatly outweighed its probative value. Accordingly, the trial court abused its
discretion by admitting the Vogt Street offense during the State's case-in-chief
over the defense's Rule 403 objection. See Tex. R. Evid. 403. Because
we conclude that the admission of this extraneous offense affected Russell's
substantial rights, we reverse the trial court's judgment and remand this case
for a new trial.
II. Procedural and Factual
Background
On September 3, 1997, Russell and three
accomplices committed a robbery at a Fort Worth pool hall known as Fast
Freddy's. During the robbery, Russell shot the manager of Fast Freddy's, David
Chapa, in the head and killed him. The robbery at Fast Freddy's and the murder
of Chapa at Fast Freddy's are collectively referred to herein as the Fast
Freddy's offense.
Russell was indicted for the capital
murder of Chapa. He pleaded not guilty, and trial commenced before a duly
empaneled jury. During its case-in-chief, the State introduced evidence
concerning the Fast Freddy's offense, as well as evidence of two extraneous
offenses committed by Russell: the S&A offense and the Vogt Street offense.
The S&A offense involved the capital murder of Moayad Akhras, a convenience
store clerk at the S&A Food Store. The S&A offense occurred
approximately ninety minutes before the Fast Freddy's offense. Russell concedes
that the S&A offense was a "virtual carbon copy" of the Fast
Freddy's offense and was admissible to show identity and intent regarding the
capital murder of Chapa. The Vogt Street offense occurred on October 11, 1997,
five weeks after the Fast Freddy's offense, and involved the burglary/robbery,
sexual assault, attempted murder, and murder of two female victims.
Russell offered no evidence during the
guilt-innocence phase of his trial. The jury found Russell guilty of capital
murder. Following the punishment phase of the trial, the trial court sentenced
Russell to life imprisonment.
III. The Vogt Street
Extraneous Offense
In his fifth point, Russell contends that
the trial court abused its discretion by admitting evidence of the Vogt Street
extraneous offense in violation of Rules 404(b) and 403 of the Texas Rules of
Evidence. See Tex. R. Evid. 403, 404(b). In the Vogt Street offense,
Russell and three accomplices entered a Fort Worth residence to commit a
robbery. One of the accomplices to the Vogt Street offense, Kevin Barnes,
participated with Russell in the Fast Freddy's offense and in the S&A
offense. During the Vogt Street offense, the robbers repeatedly sexually
assaulted two women, forced them to do "nasty stuff" at gunpoint, and
eventually shot both of them. One woman was shot five times, but lived; the
other woman was shot in the head and died.
Before trial started, the State sought to
introduce the Vogt Street offense in conjunction with the S&A Food Store
offense and the Fast Freddy's offense in order to show that Russell and Barnes
acted together as the shooters in each of these offenses and, therefore,
possessed the specific intent to murder Chapa. Russell objected, arguing that
under Texas Rule of Evidence 404(b) Russell's alleged participation in a sexual
assault, robbery, and murder was not relevant to show his intent in the Chapa
murder five weeks earlier, and alternatively, that under Rule 403 the
prejudicial effect of the Vogt Street offense outweighed any probative value it
had. (1) The trial court overruled Russell's
objections and permitted the State to discuss the Vogt Street offense during
opening statements.
Later in the trial, the State articulated
that it also wanted to introduce specific, detailed facts of the Vogt Street
offense through the surviving victim for the purpose of showing identity. The
State argued that the Vogt Street offense tended to show identity "[n]ot
because it's a signature offense . . . but because it shows . . . that in each
one of these crime scenes it's the same two shooters: Kevin Barnes and Carlis
Russell." Russell's counsel again objected, explaining that he did not
believe "404(b) contemplates an exception to the general exclusionary rule
based upon the association of parties here . . . to allow the introduction of
all extraneous offenses because somebody's friends with somebody or somebody
runs with somebody, I don't believe is supported by the case law and is not
contemplated by 404(b)." Russell's counsel also objected that even if the
Vogt Street offense was relevant, its probative value was nonetheless greatly
outweighed by its prejudicial effect. The trial court again overruled Russell's
objections and allowed admission of the details of the Vogt Street offense.
A. Standard of Review for
a Determination Under Rule 404(b)
Rule 404(b) embodies the established
principle that a defendant is not to be tried for collateral crimes or for being
a criminal generally. Tex. R. Evid. 404(b); Nobles v. State, 843 S.W.2d
503, 514 (Tex. Crim. App. 1992); Booker v. State, 103 S.W.3d 521, 530
(Tex. App.--Fort Worth 2003, pet. filed) (op. on reh'g); Curtis v. State,
89 S.W.3d 163, 170 (Tex. App.--Fort Worth 2002, pet. ref'd). Consequently,
extraneous offenses are not admissible at the guilt-innocence phase of trial to
prove that a defendant acted in conformity with his character by committing the
charged offense. Tex. R. Evid. 404(b); Booker, 103 S.W.3d at 529; Martin
v. State, 42 S.W.3d 196, 201 n.2 (Tex. App.--Fort Worth 2001, pet. ref'd).
An extraneous offense, however, has noncharacter- conformity relevance where it
has any tendency to make the existence of a fact that is of consequence to the
determination of the action more or less probable than it would be without the
evidence. Tex. R. Evid. 401; Powell v. State, 63 S.W.3d 435, 438 (Tex.
Crim. App. 2001). That is, extraneous offense evidence that tends to make more
or less probable an elemental or evidentiary fact or tends to rebut some
defensive theory is relevant beyond its tendency to prove a person's character
or that he acted in conformity therewith. Montgomery v. State, 810
S.W.2d 372, 386-87 (Tex. Crim. App. 1991) (op. on reh'g); Johnson v. State,
932 S.W.2d 296, 301 (Tex. App.--Austin 1996, pet. ref'd). Consequently, evidence
of other crimes or extraneous misconduct may be admissible to prove motive,
opportunity, intent, preparation, plan, knowledge, or absence of mistake or
accident. Tex. R. Evid. 404(b); Booker, 103 S.W.3d at 529-30. The
State, as the proponent of extraneous offense evidence, bears the burden of
showing admissibility. See Rankin v. State, 974 S.W.2d 707, 718 (Tex.
Crim. App. 1998) (op. on reh'g).
The trial court's task is to determine
whether extraneous offense evidence is relevant for a purpose other than the
propensity of the defendant to commit crimes or other bad acts. Booker,
103 S.W.3d at 530. Rulings on relevance should be left largely to the trial
court, relying on its own observations and experience, and will not be reversed
absent an abuse of discretion. Moreno v. State, 858 S.W.2d 453, 463
(Tex. Crim. App.), cert. denied, 510 U.S. 966 (1993); Corley v.
State, 987 S.W.2d 615, 618 (Tex. App.--Austin 1999, no pet.). Moreover,
appellate courts should give great discretion to the trial courts in matters of
relevancy, reversing only if the trial court acts outside "the zone of
reasonable disagreement." Montgomery, 810 S.W.2d at 391. A trial
court's ruling on admissibility should not be disturbed simply because an
appellate judge might decide a question differently than the trial judge. Id.
So long as the trial court's decision to admit or exclude evidence falls in the
zone within which reasonable minds may differ, appellate courts should refrain
from disturbing the trial court's decision on appeal. Id.; Osby v.
State, 939 S.W.2d 787, 789 (Tex. App.--Fort Worth 1997, pet. ref'd).
B. Rule 404(b) Relevance
Determination
The State asserts that the Vogt Street
offense was relevant to the issues of intent and identity in the Fast Freddy's
offense. Russell contends, however, that the Vogt Street offense was not
relevant; he argues that the State impermissibly utilized the Vogt Street
offense to show his character, to show he acted in conformity with that
character in murdering Chapa, and to try him as a criminal generally.
1. Intent
In a prosecution for capital murder under
penal code section 19.03(a)(2), in order to convict the accused as a primary
actor the State must prove and the jury must find that he "intentionally
commit[ted] the murder" in the course of the underlying felony. Tex. Penal
Code Ann. § 19.03(a)(2) (Vernon 2003); Tucker v. State, 771 S.W.2d
523, 530 (Tex. Crim. App. 1988), cert. denied, 492 U.S. 912 (1989); Barnes
v. State, 56 S.W.3d 221, 226 (Tex. App.--Fort Worth 2001, pet. ref'd).
Moreover, before the accused may be found criminally responsible for the conduct
of another who "intentionally commit[s] the murder" under the law of
parties set forth in penal code section 7.02(a)(2), it must be shown the accused
harbored a specific "intent to promote or assist the commission of"
the intentional murder that the other committed. Tex. Penal Code Ann. §
7.02(a)(2); Lawton v. State, 913 S.W.2d 542, 554-55 (Tex. Crim. App.
1995), cert. denied, 519 U.S. 826 (1996); Barnes, 56 S.W.3d at
229. The court of criminal appeals has held that "[o]ne could hardly
indulge an intent to promote or assist in the commission of an intentional
murder without, at a minimum, intending or contemplating that lethal force would
be used." Barnes, 56 S.W.3d at 236 (citing Tucker, 771
S.W.2d at 530).
Here, the court charged the jury that if
it believed from the evidence beyond a reasonable doubt that Russell:

 intentionally cause[d] the death of an
 individual, David Chapa by shooting David Chapa with a deadly weapon, to-wit:
 a firearm, in the course of committing or attempting to commit the offense of
 robbery, you will find the defendant guilty of the offense of Capital Murder
 and so say by your verdict, or if you believe from the evidence beyond a
 reasonable doubt, that . . . Kevin Barnes or Kevin Richardson intentionally
 caused the death of an individual, David Chapa by shooting David Chapa with a
 deadly weapon, to-wit: a firearm, in the course of committing or attempting to
 commit the offense of robbery and the defendant, Carlis Jovonite Russell
 acting with the intent that the capital murder of David Chapa be committed did
 solicit, encourage, direct, aid or attempt to aid Kevin Barnes or Kevin
 Richardson to commit the offense, by carrying a weapon during the robbery, if
 any, by taking property from customers, if he did, by threatening customers,
 by removing property from the business establishment, or by firing his weapon
 during the robbery, if he did, then you will find the defendant, Carlis
 Jovonite Russell guilty of the offense of Capital Murder.

Thus, the jury was authorized to find
Russell guilty if he shot Chapa in the course of the robbery at Fast Freddy's. See
Tex. Penal Code Ann. § 19.03(a)(2). The jury was also authorized to find
Russell guilty under the law of parties if Kevin Barnes or Kevin Richardson shot
Chapa in the course of the robbery at Fast Freddy's and Russell, acting with the
intent that capital murder of Chapa be committed, solicited, encouraged,
directed, aided or attempted to aid Kevin Barnes or Kevin Richardson in
committing capital murder, by carrying a weapon during the robbery, taking
property from customers, threatening customers, removing property from the
business establishment, or firing his weapon during the robbery. See id.
§ 7.02(a)(2).
Russell asserted at trial, and asserts on
appeal, that the Vogt Street offense was not relevant to show his intent with
regard to the Fast Freddy's offense because the Vogt Street offense occurred
five weeks after the Fast Freddy's offense. At trial, the State cited three
out-of-state cases indicating that subsequent extraneous offenses are admissible
to show a defendant's intent as to an earlier offense. See U.S. v. Germosen,
139 F.3d 120, 128 (2d Cir. 1998) (upholding admission of
subsequent act under Federal Rule of Evidence 404(b) to show intent regarding
charged offense and holding, "[t]he fact that the evidence involved a
subsequent rather than prior act is of no moment"); U.S. v. Latney,
108 F.3d 1446, 1449 (D.C. Cir.) (construing Federal Rule of Evidence 404(b) and
holding that it "draws no distinction between bad acts committed before and
bad acts committed after the charged offense"), cert. denied, 522
U.S. 940 (1997); U.S. v. Olivo, 80 F.3d 1466, 1468 (10th
Cir. 1996) (same). Although these federal court decisions are not binding, when
a Texas Rule of Evidence duplicates a Federal Rule of Evidence, as here,
greater-than-usual deference should be given to the federal courts'
interpretations of the federal rule. Tamez v. State, 11 S.W.3d 198, 201
(Tex. Crim. App. 2000). The trial court, by overruling Russell's objection that
the Vogt Street offense was inadmissible because it occurred after the Fast
Freddy's offense, acted in accordance with the persuasive legal authorities
presented to it. See also Santellan v. State, 939 S.W.2d 155, 168 (Tex.
Crim. App. 1997) (holding extraneous conduct subsequent to the charged offense
admissible); Torres v. State, 794 S.W.2d 596, 599 (Tex. App.--Austin
1990, no pet.) (same). Accordingly, we hold that the trial court did not abuse
its discretion by rejecting Russell's contention that the Vogt Street offense
was not admissible simply because it occurred after the Fast Freddy's offense. Cf.
Montgomery, 810 S.W.2d at 380 (recognizing that an abuse of discretion
occurs when the trial court acts without reference to any guiding principles or
rules).
Although, based on the authorities cited
by the State, the Vogt Street offense was not per se inadmissible on the ground
that it occurred after the Fast Freddy's offense, the State nonetheless bore the
burden of establishing that the Vogt Street offense made the existence of some
fact of consequence in proving the Fast Freddy's offense more or less probable
than it would be without the evidence. See Tex. R. Evid. 401; Rankin,
974 S.W.2d at 718. The State argued:

 [T]he important point is that it [i.e.,
 the Vogt Street offense] requires the identically same intent. . . . So, it
 doesn't matter what the location is; it does matter the fact that the specific
 intent to kill during a robbery is illustrated by the Vogt Street crime as it
 is by the S&A crime and as it is in the Fast Freddy's crime.

 
The State explained, "Our allegation
is, it's the same two shooters at each of these locations. And the point is that
it shows that their implied understanding of what each of them would do in each
of these crimes, that is, the use--the employment of deadly force." Thus,
the State's argument can be summarized as follows: because Russell and Barnes
had killed before during a robbery in the S&A offense and had killed
subsequently during a robbery in the Vogt Street offense, the fact that Russell
and Barnes intended to kill or contemplated the use of lethal force during the
Fast Freddy's robbery is more likely.
On appeal, the State couches its argument
that the Vogt Street offense is relevant to prove Russell's intent in the Chapa
capital murder as the "doctrine of chances," citing Morgan v.
State, 692 S.W.2d 877 (Tex. Crim. App. 1985), Plante v. State, 692
S.W.2d 487 (Tex. Crim. App. 1985), and Keller v. State, 818 S.W.2d 425
(Tex. App.--Houston [1st Dist.] 1992, pet. ref'd).(2)
In Morgan, a pre-Montgomery case, the court of criminal
appeals explained that:

 where the material issue addressed is
 the defendant's intent to commit the offense charged, the relevancy of the
 extraneous offense derives purely from, the point of view of the doctrine of
 chances -- the instinctive recognition of that logical process which
 eliminates the element of innocent intent by multiplying instances of the same
 result until it is perceived that this element cannot explain them all.
 Without formulating any accurate test, and without attempting by numerous
 instances to secure absolute certainty of inference, the mind applies this
 rough and instinctive process of reasoning, namely, that an unusual and
 abnormal element might perhaps be present in one instance, but that the
 oftener similar instances occur with similar results, the less likely is the
 abnormal element likely to be the true explanation of them.

Morgan, 692 S.W.2d at 881
(citations omitted). The Morgan court then concluded, "Before an
extraneous offense is admissible to negate the possibility of accident under
Wigmore's doctrine of chances, such offense must be sufficiently similar in
nature to the charged offense that the inference of improbability of accident
logically comes into play." Id. Thus, when the defendant raises
the issue of accident or mistake, extraneous offense or bad acts evidence may be
admissible under the doctrine of chances because it tends to make an accident or
mistake less probable and tends to make the fact that the defendant intended the
act more probable. Montgomery, 810 S.W.2d at 386-87; see also
Dowler v. State, 777 S.W.2d 444, 447-48 (Tex. App.--El Paso 1989, pet.
ref'd) (holding extraneous offenses of murder by cyanide poisoning relevant to
charge of murder by chloroform poisoning).
The doctrine of chances, however, does not
support the admissibility of the Vogt Street offense in the present case. In Morgan,
Plante, and Keller, each defendant either raised the issue of
accident or mistake, or the defendant's conduct was as consistent with accident
as with a specific intent. See Morgan, 692 S.W.2d at 881 (holding
extraneous acts of touching of complainant and her friend were admissible in
indecency with a child prosecution because defendant's charged conduct was as
consistent with accident as with a specific lascivious intent); Plante,
692 S.W.2d at 490, 492-94 (holding defendant's extraneous acts of nonpayment for
sale, lease, or loan of goods and services were admissible in prosecution for
theft by deception because defendant's intent could not be inferred from his
nonpayment in the charged offense); Keller, 818 S.W.2d at 429 (holding
defendant's extraneous acts of nonpayment for goods and services were admissible
in prosecution for theft of service because defendant's intent could not be
inferred from his nonpayment in the charged offense). Here, Russell never
contended that either he or Barnes accidently or mistakenly shot Chapa. Rather,
through cross-examination of the State's witnesses, Russell raised the issue of
whether Ray Williams, who drove the getaway car from the Fast Freddy's offense,
was in fact the person who shot Chapa.
Here, Dr. Marc Andrew Krouse, Deputy Chief
Medical Examiner, testified that Chapa was killed by a single gunshot wound to
the back of his head. The gun was placed very close to the back of Chapa's
head--a few inches to about a foot or foot and a half--because gun powder
residue and stippling were present on Chapa's scalp around the entrance wound
made by the bullet. The record before us contains no evidence that Russell or
Barnes accidently or mistakenly shot Chapa. The gun firing the bullet that
killed Chapa was mere inches to perhaps a foot and a half from the back of
Chapa's head; whoever pulled the trigger definitely intended to kill Chapa. Nor
is the shooting of Chapa as consistent with an accident as it is with a specific
intent to kill.
Finally, even under the doctrine of
chances, the State may not introduce extraneous offenses as circumstantial
evidence of an element in its case-in-chief if that element can readily be
inferred from other uncontested evidence. Clark v. State, 726 S.W.2d
120, 122 (Tex. Crim. App. 1987) (op. on reh'g); DeLeon v. State, 77
S.W.3d 300, 312 (Tex. App.--Austin 2001, pet. ref'd). That is, where the State's
evidence clearly shows the intent element of the crime and that evidence is
uncontradicted by the defendant or not undermined by cross-examination of the
State's witnesses, the offer of other crimes is unjustified. See Morgan,
692 S.W.2d at 882 n.3.
Here, the State possessed other evidence
of Russell's specific intent to kill Chapa. Kendra Stephens, a witness to the
Fast Freddy's offense, identified Russell from a photo-lineup as the gunman who
shot Chapa. She testified that the gunman had "puff balls" in his
hair, wore Jump Man tennis shoes, and yelled at her friends LaShonda and Tamara,
two Fast Freddy's patrons, to "shut up" and stop screaming or
"I'll kill you." Russell was wearing Jump Man shoes when he was
arrested.
Kevin Richardson testified that he was in
a car with Barnes and Russell and driven by Williams when Barnes and Russell
exited the car with guns to rob the S&A Food Store. Barnes had a .380
caliber gun and Russell had a .9 millimeter gun. Barnes and Russell entered
S&A Food Store, Richardson heard two gun shots, and then Barnes and Russell
came running back to the car, arguing over who had shot Akhras. Richardson said
that as they were driving Barnes home after the S&A offense, Russell told
Williams to pull into an apartment complex because they were going to rob Fast
Freddy's, located across the street.
Russell, with his .9 millimeter, Barnes,
with his .380, and Richardson entered Fast Freddy's. Barnes went to the back,
behind the bar, got the money, and ran out. Russell then went behind the bar,
and Richardson heard a shot. Russell then came running out of Fast Freddy's.
Russell indicated that he shot Chapa because Chapa had looked at him.
Samuel Bridgett testified that he met
Russell through Kevin Richardson, who is his cousin by marriage. Bridgett
testified that Russell admitted shooting "a guy" during the Fast
Freddy's offense "because he was looking at him."
Robert Adkins, a firearms examiner with
the Fort Worth Police Department, testified that he examined evidence found at
both the S&A offense and the Fast Freddy's offense. He testified that two
firearms were fired at the S&A offense: a .380, firing Remington .380
automatic bullets, and a .9 millimeter, firing Fiocchi .9 millimeter bullets
and/or full metal jacket bullets. A Fiocchi .9 millimeter casing was found at
Fast Freddy's, and it was fired from the same gun as the Fiocchi .9 millimeter
casing found at S&A Food Store.
Russell contends that the State conceded
it had ample evidence of Russell's specific intent to kill in the Fast Freddy's
offense when the prosecutor made the following closing argument:

 I want you to go back and think about
 what this Defendant was saying to those women and those individuals in that
 back room when he was pointing a gun on him -- them. Using phrases, quote,
 unquote, "Bitch, don't move or I'll shoot you. I will kill you. I will
 shoot you. Give me your money and I will kill you." Each of those
 statements go to his intent, his intent to kill, whether as a party or as the
 shooter himself.

Russell also points out that in addition
to the testimony of witnesses to the Fast Freddy's offense concerning his
statements during the robbery, the State proved up the S&A offense to
establish his specific intent in the capital murder of Chapa. The record before
us contains ample evidence, as well as the S&A extraneous offense, to prove
Russell's specific intent to kill Chapa. For these reasons, we cannot agree with
the State's contention that the Vogt Street offense was relevant to prove
Russell's intent by virtue of the application of the doctrine of chances.
Nonetheless, deferring as we must to the
trial court's reliance on its own observations and experience in making a Rule
404(b) relevancy determination, we cannot say that the trial court abused its
discretion by concluding that the Vogt Street offense bore some relevance to the
issue of Russell's specific intent in the capital murder of Chapa. See,
e.g., Bradshaw v. State, 65 S.W.3d 232, 237 (Tex. App.--Waco 2001, no pet.)
(holding extraneous acts relevant to show intent in charged offense). The
court's charge authorized the jury to convict Russell under the law of parties
if, acting with the intent that the capital murder of David Chapa be
committed, Russell solicited, encouraged, directed, aided, or attempted to
aid Barnes or Richardson in the murder of Chapa. The Vogt Street offense makes
more probable Russell's specific intent in Chapa's capital murder if the jury
believed that Russell himself did not shoot Chapa, but was guilty as a party.
That is, as the State contends, Russell's specific intent to kill during the
Fast Freddy's offense is more probable because the Vogt Street offense and the
S&A offense, involving the same shooters as the Fast Freddy's offense, shows
the shooters' implied understanding and consent to the use of deadly force by
the others during these robberies. See Barnes, 56 S.W.3d at
229. We hold that the trial court's implied determination that the Vogt Street
offense was relevant to show Russell's intent in the Fast Freddy's offense falls
at least within the zone of reasonable disagreement. See Montgomery,
810 S.W.2d at 391.
2. Identity
The State also asserts that the Vogt
Street offense was relevant to establish Russell's identity in the Fast Freddy's
offense. The State did not offer the Vogt Street offense as a signature offense,
however, but argued that it tended to show identity "because it shows . . .
that in each one of these crime scenes [S&A offense, Fast Freddy's offense,
and Vogt Street offense] it's the same two shooters: Kevin Barnes and Carlis
Russell." Thus, the State's argument centers on the theory that because
identical participants were involved as shooters, the Vogt Street offense tends
to show identity in the Fast Freddy's offense. Russell again, however, contends
that the Vogt Street offense was used to show character conformity in violation
of Rule 404(b).
Identity is an "elemental fact"
in every criminal case with relevance apart from character conformity. Montgomery,
810 S.W.2d at 387. When identity is an issue in the case, evidence of an
extraneous offense may be admissible to show identity. Lane v. State,
933 S.W.2d 504, 519 (Tex. Crim. App. 1996); Avila v. State, 18 S.W.3d
736, 739 (Tex. App.--San Antonio 2000, no pet.). Typically, to be relevant to
the issue of identity, extraneous offenses must share multiple common
characteristics, or the device used in each offense must be so usual and
distinctive as to be like a signature. See, e.g., Taylor v. State,
920 S.W.2d 319, 322 (Tex. Crim. App.), cert. denied, 519 U.S. 951
(1996). That is, "to be admissible to show identity, an extraneous offense
must be so similar to the charged offense as to mark the offenses as
the defendant's handiwork." Johnson v. State, 68 S.W.3d 644,
650-51 (Tex. Crim. App. 2002) (emphasis added).
We have located no case law authority for
the proposition that a defendant's association with another to commit prior and
subsequent offenses makes his identity as the perpetrator of the present offense
along with the other person more probable. The Vogt Street offense raises only a
suspicion as to identity in the Fast Freddy's offense that culminates from the
association of Barnes and Russell. Accord Wincott v. State, 59 S.W.3d
691, 700-01 (Tex. App.--Austin 2001, pet. ref'd) (holding suspicion that some
combination of individuals participated in five robberies was insufficient to
corroborate accomplice testimony). "[G]uilt by association [is] one of the
most odious institutions of history . . . . Guilt under our system of government
is personal." Id. (quoting Joint Anti-Fascist Refugee Comm. v.
McGrath, 341 U.S. 123, 178, 71 S. Ct. 624, 652 (1951)). Any determination
that Russell's identity in the Fast Freddy's offense was more probable because
of Russell's subsequent association with Barnes in the Vogt Street offense
constituted an abuse of discretion because it authorized an inference of guilt
by association, that is, an inference that because Russell acted with Barnes in
the Vogt Street offense, he also was the person who acted with Barnes in the
Fast Freddy's offense. See generally Tex. R. Evid. 404(b)
(prohibiting the use of extraneous offenses to prove character and subsequent
conduct in conformity with that character); Ford v. State, 484 S.W.2d
727, 729 (Tex. Crim. App. 1972) (holding that extraneous offense evidence must
be relevant on some theory other than the general proposition that one who
commits one crime is prone to commit another). The Vogt Street offense was not
relevant to prove Russell's identity in the Fast Freddy's offense and to the
extent the trial court admitted the Vogt Street offense on this basis, it abused
its discretion.
C. Standard of Review for
Trial Court's Rule 403 Determination
Having determined that whether the Vogt
Street offense was relevant to Russell's intent in the Fast Freddy's offense is
at least within the "zone of reasonable disagreement," we next review
whether the trial court abused its discretion by overruling Russell's Rule 403
objection. If a trial court determines that evidence of other crimes or
extraneous misconduct has relevance aside from character conformity, and a
timely, proper Rule 403 objection is made, the trial court must make a balancing
determination under Rule 403. Montgomery, 810 S.W.2d at 388-89. Rule
403 provides that "[a]lthough relevant, evidence may be excluded if its
probative value is substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.
Only "unfair" prejudice provides the basis for exclusion of relevant
evidence. Montgomery, 810 S.W.2d at 389. Unfair prejudice arises from
evidence that has an undue tendency to suggest that a decision be made on an
improper basis, commonly an emotional one. Id. A presumption exists
that relevant evidence will be more probative than prejudicial. DeLeon,
77 S.W.3d at 315. In evaluating the trial court's determination under Rule 403,
a reviewing court is to reverse the trial court's judgment "rarely and only
after a clear abuse of discretion," recognizing that the trial court is in
a superior position to gauge the impact of the relevant evidence. Mozon v.
State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); Montgomery, 810
S.W.2d at 389; Curtis, 89 S.W.3d at 170.
The trial court's balancing determination
must be measured against the relevant criteria by which a Rule 403 decision is
made. Mozon, 991 S.W.2d at 847. The relevant criteria in determining
whether the prejudice of an extraneous offense substantially outweighs its
probative value include: (1) how compellingly the extraneous offense evidence
serves to make a fact of consequence more or less probable--a factor which is
related to the strength of the evidence presented by the proponent to show the
defendant in fact committed the extraneous offense; (2) the potential the other
offense evidence has to impress the jury "in some irrational but
nevertheless indelible way"; (3) the time the proponent will need to
develop the evidence, during which the jury will be distracted from
consideration of the indicted offense; and (4) the force of the proponent's need
for this evidence to prove a fact of consequence, that is, does the proponent
have other probative evidence available to him to help establish this fact, and
is this fact related to an issue in dispute. Id. (citing Montgomery,
810 S.W.2d at 389-90). When the relevant criteria are viewed objectively and
lead to the conclusion that the danger of unfair prejudice substantially
outweighs the probative value of the proffered evidence, the appellate court
should declare that the trial court erred in failing to exclude it. Curtis,
89 S.W.3d at 170 (citing Montgomery, 810 S.W.2d at 392).
D. Rule 403 Balancing Test
Russell argues that the trial court abused
its discretion by admitting evidence of the Vogt Street offense under Rule 403
because there was little evidence connecting him to the Vogt Street offense and
the prejudicial effect of the Vogt Street offense evidence was substantial. He
further argues that the offense was distinctly dissimilar to the Fast Freddy's
offense, that the State devoted a significant amount of time to developing
evidence regarding the offense, and that the State did not have the
"slightest need" for the offense in light of the facts surrounding the
Fast Freddy's offense and the S&A Food Store extraneous offense, which
Russell admits was admissible as a "virtual carbon-copy" of the Fast
Freddy's offense.
1. Factor One--Degree of
Relevance and Strength of Evidence
Applying the Rule 403 balancing factors
set out in Montgomery, we first examine how compelling the Vogt Street
offense is of Russell's intent in the Fast Freddy's offense. In performing this
review, we also examine the strength of the evidence connecting Russell to the
Vogt Street offense. The surviving victim of the Vogt Street offense testified
that a few days before the offense, a man named Myron Nash, whose nickname was
"Big O," came to her house, along with two other men, to drop off some
property for her to store. She positively identified Russell as one of the two
men who accompanied Nash.
With respect to the Vogt Street offense,
however, the surviving victim could not identify Russell as being one of the
participants involved in the offense. She testified that all of the robbers wore
blue bandanas that covered their faces from the nose down. She provided a
detective with only "general descriptions" and nothing that led him to
identify any suspects. Additionally, no DNA evidence or other physical evidence
linked Russell to the offense. However, the surviving victim's testimony about
the specifics of the offense was corroborated by Tonero Rainey and Andre
Edwards.
Rainey, who is a relative of Russell's,
testified that, on October 9, 1997, he, Myron Nash or "Big O," and
Russell went to the Vogt Street residence and dropped off some weapons. He and
Russell drove there in his vehicle, a 1978 Cadillac, which he identified in
State's exhibit 22. State's exhibit 22, a picture taken by police at the time
they were investigating the October 11th Vogt Street offense, showed Rainey's
vehicle parked in the driveway at the Vogt Street residence. Rainey further
testified that, while he and Russell were in jail, Russell told him about the
Vogt Street offense. Russell told him they had gone there looking for "Big
O" and had asked the girls where the weapons were, but they did not know.
Russell then told him that one of the girls started screaming, so he shot her in
the head.
Edwards testified that he is Christopher
Hill's cousin and that he knows Russell. He stated that, on October 11, 1997,
while he was staying at Kevin Barnes's house, Hill came over with Deangus Wright
and another individual because Hill wanted to "hit a lick," which is a
term for making some money illegally. Barnes, Hill, and Wright then began
talking about looking for "Big O" because he had taken their guns.
They called Russell and told him they were going to get "Big O." The
group then prepared to go out by gathering masks and guns, but Edwards did not
go with them. Later that evening, Barnes, Hill, Wright, and Russell awakened
Edwards by knocking on the door to his aunt's house where he was staying, which
was "right across down the street from that Fast Freddy's." Edwards
testified that Barnes told him they had "killed the girls," had
"made 'em do a lot of nasty stuff," and that Russell made them perform
sexual acts. Barnes told him that Russell had told him to "[s]hoot 'em"
and that "he shot 'em in the booty," but that his gun jammed, so
Russell shot one woman in the head. Barnes also told him that Hill and Russell
shot the other girl. Barnes stated he could "hear them screaming in his
head." Edwards testified that Russell was present when Barnes made these
statements and that Russell did not say anything, but was just "sitting
there like he was okay with it." Edwards later testified that Russell told
him that he shot the deceased Vogt Street victim "[b]ecause she was
screaming," and that when he asked Russell how he could do that kind of
thing, Russell responded that "[a]fter you kill so many people, it doesn't
matter no more."
DNA evidence corroborated Edwards's
testimony. Although no DNA evidence linked Russell to the Vogt Street offense,
DNA evidence did link Barnes, Hill, and Wright to the offense.
Thus, the evidence at trial did tend to
connect Russell to the Vogt Street offense, specifically as one of the shooters
along with Barnes. This evidence serves to make the issue of Russell's intent in
the Fast Freddy's offense slightly more probable, weighing in favor of its
admission. See Montgomery, 810 S.W.2d at 394 (holding evidence of
extraneous acts--that father walked around nude with erection in front of
children--was relevant to issue of intent in father's prosecution for indecency
with a child although probative value of such evidence was outweighed by its
prejudicial effect). We, therefore, conclude that the first Montgomery
factor weighs very slightly in favor of the admissibility of the Vogt Street
extraneous offense to prove Russell's intent as the primary actor or as a party
to Chapa's capital murder.
2. Factor Two--Irrational,
Indelible Impression
The second Montgomery factor, the
potential of the extraneous offense evidence to impress the jury "in some
irrational but nevertheless indelible way," here weighs heavily in favor of
exclusion of the Vogt Street offense. See Taylor v. State, 93 S.W.3d
487, 504, 506-07 (Tex. App.--Texarkana 2002, pet. ref'd) (holding trial court
abused its discretion under Rule 403 by admitting despicable story written by
defendant about "sex enjoyed by men and women with both willing and
unwilling young girls" in prosecution for possession of child pornography);
Manning v. State, 84 S.W.3d 15, 23 (Tex. App.--Texarkana 2002, pet.
granted) (holding trial court abused its discretion under Rule 403 by admitting
evidence of cocaine metabolite in defendant's bloodstream in prosecution for
vehicular manslaughter where evidence established metabolite has no cocaine-like
effects and no evidence existed defendant was under influence of cocaine at time
of accident). In Montgomery, the court of criminal appeals reversed the
Dallas Court of Appeals for upholding the trial court's determination that
evidence that the appellant walked around naked, with an erection, in front of
his children was more probative than prejudicial in appellant's prosecution for
indecency with a child. 810 S.W.2d at 397. Specifically, the court of criminal
appeals explained:

 Though relevant, such evidence has only
 marginal probative value. By contrast, the danger of unfair prejudice from
 such testimony is substantial. Both sexually related misconduct and misconduct
 involving children are inherently inflammatory. Many in our society would
 condemn appellant for his conduct whether they believed it showed sexual
 arousal directed at his children, an undifferentiated sexual arousal
 imprudently displayed, or simply an incidental erection coupled with a
 damnable nonchalance. In any event there was a grave potential for decision on
 an improper basis, as jurors may have lost sight of specific issues they were
 called upon to decide and convicted appellant out of a revulsion against his
 parental demeanor.

Id.
Here, the testimony regarding the Vogt
Street offense revealed that both the victims were held at gunpoint by four
robbers; were repeatedly orally, anally, and vaginally assaulted over an
extended length of time; were forced to perform oral sex on at least one of the
perpetrators and on each other; were stripped of their clothing and forced to
crawl on their hands and knees through the residence; and were ultimately shot.
The Vogt Street extraneous offense involved not only inherently inflammatory
sexually related misconduct but a horrifying nightmare told
emotionally--demonstrated by "(weeping)" parentheticals in the
reporter's record--by a victim of this terror.
Additionally, the trial court admitted
into evidence a number of exhibits relating to the offense, including seven
photographs of the deceased victim. Two of these seven photographs are
particularly gruesome, showing the victim's nude body--one lying face-up and the
other face-down--at the crime scene. The State introduced both of these
photographs early in its presentation of evidence of the Vogt Street offense and
published them to the jury on a television screen. Of the remaining photographs,
two showed close-ups of the victim's head, again one face-up and the other
face-down; the others, which were taken by the medical examiner, depicted
close-ups of the victim's gunshot wounds to the head and buttocks and showed a
close-up of the victim's face.
The surviving victim's graphic,
minute-by-minute description of the events at the Vogt Street residence--the
words that were said, hearing her best friend shot in the other room, and her
terror during these events--as well as the shocking photographs of the deceased
victim, is simply not the type of evidence that can be filed away in some
compartment of the mind and considered for only a limited purpose. See
Taylor, 93 S.W.2d at 506; Montgomery, 810 S.W.2d at 397
(recognizing that limiting instruction "would not likely have neutralized
the danger" that the jury would lose sight of the specific issues they were
to decide); Hilliard v. State, 881 S.W.2d 917, 920 (Tex. App.--Fort
Worth 1994, no pet.). Although the trial court instructed the jury that it was
not to consider the extraneous offenses except for purposes of intent and
identity, the heinous nature of the Vogt Street offense and the
emotionally-charged testimony of the surviving victim was likely to create such
great prejudice in the minds of the jury that it would have been unable to limit
its consideration of the Vogt Street offense evidence to its proper purpose of
showing Russell's intent in the Fast Freddy's offense. See Curtis, 89
S.W.3d at 176 (noting jury was likely to draw impermissible character conformity
inference from extraneous sexual offense and that extraneous offense evidence
invited the jury to convict defendant on a moral or emotional basis). The
evidence concerning the Vogt Street offense invites the jury to convict Russell
based on outrage at his conduct in the Vogt Street offense and based on sympathy
for the surviving victim of that offense. The Vogt Street offense is more
heinous than the Fast Freddy's offense and very likely impressed the jury in
some indelible way to convict Russell based on the Vogt Street offense, instead
of for the Fast Freddy's offense. The second Montgomery factor weighs
strongly in favor of exclusion of the Vogt Street extraneous offense.
3. Factor Three--Time
Needed
The third Montgomery factor, the
time the proponent needs to develop the extraneous offense evidence, during
which the jury is distracted from consideration of the charged offense, also
weighs in favor of exclusion of the Vogt Street extraneous offense. The State
spent a significant amount of time presenting evidence of the Vogt Street
offense. The State first mentioned the offense during its opening statement.(3)
The State then introduced evidence of the offense through the testimony of
twelve witnesses, including the above-referenced, emotionally-charged testimony
of the surviving victim. The State offered, as explained above, numerous
exhibits concerning the Vogt Street offense. The State also referred to the
offense several times during closing arguments.(4)
Our review of the record reveals that a
little more than 200 pages out of approximately 682 pages of testimony, or about
thirty percent of the trial, was devoted to the Vogt Street offense. By way of
contrast, about 350 pages of the trial testimony was devoted to proving the
charged offense, and about 130 pages of trial testimony was devoted to the
S&A offense. Given the significant amount of time devoted to the Vogt Street
offense and the amount and nature of the testimony and evidence adduced with
regard to the offense, we conclude that the third Montgomery factor
weighs in favor of exclusion of the Vogt Street extraneous offense. See
Booker, 103 S.W.3d at 521 (noting third Montgomery factor weighed
in favor of excluding extraneous offense when trial time spent proving
extraneous offense exceeded time spent proving charged offense); Manning,
84 S.W.3d at 23-24 (noting third Montgomery factor weighed in favor of
excluding extraneous offense when one-fifth of trial time was spent proving
extraneous offense).
4. Factor Four--State's
Need
Finally, we consider the fourth Montgomery
factor, the State's need for the extraneous offense evidence. Evidence of the
extraneous offense must be given less weight if the State's intent evidence is
strong. See Montgomery, 810 S.W.2d at 390 (stating that "[w]hen
the proponent has other compelling or undisputed evidence to establish the
proposition or fact that the extraneous misconduct goes to prove, the misconduct
evidence will weigh far less than it otherwise might in the
probative-versus-prejudicial balance") (emphasis added). The State may not
introduce extraneous offenses as circumstantial evidence of an element in its
case-in-chief if that element can readily be inferred from other uncontested
evidence. DeLeon, 77 S.W.3d at 312 (citing Clark, 726 S.W.2d
at 122). As shown below, the State had no need for the Vogt Street offense
because ample evidence exists concerning Russell's intent in the Fast Freddy's
offense.
a. Intent Evidence From
Fast Freddy's Offense
At trial, Stevens testified that Russell
was the man who robbed her and her friends at gunpoint in one of the back rooms
of Fast Freddy's. During the course of the robbery, she heard Russell tell her
friends: "Bitch, shut up. Bitch, shut up. I'll kill you." After taking
some items from them, Russell then ran out of the back room and jumped over the
bar, going behind the bar. She next heard him tell one of the female employees
behind the bar: "Bitch, shut up screaming. Bitch, I'll kill you." She
then heard a gunshot. Stevens's friends, Tamara Prince and LaShonda Barksdale,
also testified, corroborating much of Stevens's testimony about the robbery.
Ramona Crabtree, a Fast Freddy's employee,
testified that she was behind the bar and that Chapa was in the office when a
black man with a gun jumped over the bar and demanded money. She said the man
pointed a gun at them and told them not to look at him. Chapa told the man to
take everything in the safe and pushed her down to the ground. She heard
something that "sounded like it hit a tin can, and [her] ears were
ringing." When she tapped and pushed on Chapa, he fell over and she saw
that he was "bleeding everywhere."
Kevin Richardson, a convicted accomplice
in the S&A offense, testified that he, Russell, and others went out on
September 2, 1997 to rob a store. He stated that, after the S&A offense,
Russell decided they were going to rob Fast Freddy's. At Russell's instruction,
Richardson first went into Fast Freddy's and got some change to determine if any
police were present. He then acted as a lookout, holding the door while Russell
and Barnes went in to rob the place. He testified that Russell wore a blue rag
over his face, had a .9 millimeter gun, and went into where the pool tables were
located. Barnes had a .380 caliber gun, went behind the bar, got the money, and
ran out. Russell then went behind the bar, and Richardson heard a gunshot.
Andre Edwards's testimony about the Fast
Freddy's offense also tended to corroborate that of Stevens, Prince, and
Barksdale. Edwards testified that Barnes told him that he, Richardson, and
Russell had robbed Fast Freddy's and had "killed a dude," that the
"dude tried to run and they had shot him in the back and killed him."
Samuel Bridgett testified that he knew
Russell through Richardson, who was his cousin, and that Russell told him about
the Fast Freddy's offense and the S&A offense. Russell told him that they
went into each place, "pointed the gun and started shooting," and that
they robbed Fast Freddy's.
The above testimony from numerous
individuals provided probative evidence that Russell specifically intended the
capital murder of Chapa, whether he was acting as a party or as the shooter.
Russell's counsel did, however, attack much of this testimony on
cross-examination and in closing arguments. Specifically, counsel attacked
Stevens's testimony based on some inconsistencies between her trial testimony
and her statements to police; the fact that she identified Russell, even though
she never saw his full face; and her prior criminal history for credit card
abuse. Counsel also sought to impeach Richardson's testimony on the basis of his
lies to police and the plea bargain agreement he received in exchange for
testifying against Russell. Counsel similarly attacked Edwards's testimony based
on the deal he struck with the State. While counsel also sought to impeach
Prince's and Barksdale's testimony, he did not attempt to attack the testimony
given by Bridgett or Rainey. Although the defense brought out conflicting and
impeachment evidence via cross-examination, this evidence had little or no
bearing on the issue of Russell's intent in the Fast Freddy's offense. Cf.
Siqueiros v. State, 685 S.W.2d 68, 71 (Tex. Crim. App. 1985) (recognizing
cross-examination of State's witnesses can raise issue of identity). The State
provided probative evidence on the issue of Russell's intent in the Fast
Freddy's offense through numerous witnesses, and this evidence of intent was not
seriously undermined by the defense. Accord DeLeon, 77 S.W.3d at 313-14
(holding defense cross-examination did not raise issue of intent or identity).
b. Evidence of S&A
Offense
The State also presented evidence of the
S&A offense, which as Russell admits and the evidence shows, was a near
"carbon copy" of the Fast Freddy's offense. Both occurred within a few
hours of each other; both occurred at commercial establishments; and both
involved two masked gunmen, robbery, and murder. The S&A offense factored
heavily on the issues of both intent and identity in the Fast Freddy's offense.
Both Richardson and Edwards also testified
about the S&A offense. Richardson testified that Russell and Barnes got out
of the car with blue rags over their faces and two guns; Russell had a .9
millimeter, and Barnes had a .380 caliber gun. Both entered the store, after
which he heard two gunshots. Russell and Barnes then came running back to the
car and began arguing over who had shot the store clerk.
Edwards testified that, in Russell's
presence, Barnes told him that he and Russell may have killed somebody at the
S&A Food Store and that they had to throw the gun away. Two other witnesses,
an employee and a customer who were in the store at the time of the offense,
testified that there were two black gunmen who wore masks on their faces. Both
testified to hearing shots fired.
As previously mentioned, the State's
firearms examiner testified that he examined bullets and casings found at both
S&A Food Store and Fast Freddy's. He concluded that the .9 millimeter used
in the S&A offense was also fired during the Fast Freddy's offense.
Therefore, the State's evidence showed a strong correlation between the S&A
offense and the Fast Freddy's offense, providing both intent and identity
evidence in the Fast Freddy's offense and eliminating the need for the Vogt
Street offense.
c. No Need for Vogt Street
Offense
The evidence outlined above shows that the
State's evidence of Russell's intent in the Fast Freddy's offense was strong;
therefore, the need for the extraneous Vogt Street offense was minimal at best. See
Montgomery, 810 S.W.2d at 390; Graff v. State, 65 S.W.3d 730, 740
(Tex. App.--Waco 2001, pet ref'd) (holding, "[T]he State did not need this
evidence" [of possession of 147 boxes of cold pills used to manufacture
methamphetamine] because the State had other convincing evidence to establish
the defendant's intent to deliver methamphetamine). The State's evidence showing
Russell's intent was compelling, particularly in light of the S&A offense
and the ballistics evidence linking that offense to the Fast Freddy's offense.
The Vogt Street offense added very little to the overall evidence of Russell's
intent during the Fast Freddy's offense. See Booker, 103 S.W.3d at 534.
Finally, the State's lack of need for the
Vogt Street offense is demonstrated in the State's closing arguments. The State
argued:

 You know, you might say you go into a
 robbery, you were in a robbery, like we discussed, and my partner on his own
 initiative shoots somebody and I don't know anything about it. And maybe you
 can get a jury to buy that. But you're not going to get them to buy it when
 the facts are that you were an hour before right with me before and I shot
 someone at that store. Then you just can't claim you didn't know.

This argument by the State demonstrates
why the S&A offense alone accomplished what the State claims it needed the
Vogt Street offense to accomplish. See Reese v. State, 33 S.W.3d 238,
242 (Tex. Crim. App. 2000) (holding fourth Montgomery factor weighed
heavily in favor of exclusion of inflammatory picture when State had other
noninflammatory pictures that would have served the same purpose).
Although the State claimed it needed the
Vogt Street offense to establish Russell's intent in the Fast Freddy's offense,
the State contended in closing argument that the evidence in the case was
"overwhelming" and that there was "so much evidence . . . that
[Russell] killed David Chapa either as a party or as the shooter."
Additionally, the State argued that Richardson's testimony, as an accomplice in
both the S&A and Fast Freddy's offenses, and the corroborating evidence was
"enough to . . . return a verdict of guilty to capital murder." In
fact, the State spent most of its closing argument referencing the Fast Freddy's
offense and the S&A offense and addressing the similarities between those
two offenses and the substantial amount of evidence showing that Russell
participated in those crimes as either a party or a shooter. The evidence,
indeed, supports the State's assertions. We conclude that the fourth Montgomery
factor weighs heavily in favor of exclusion of the Vogt Street extraneous
offense.
Affording all due deference to the trial
court's Rule 403 decision, our review of the record and the relevant criteria
under Rule 403 demonstrates that the very low probative value of the Vogt Street
offense on the issue of Russell's intent in the Fast Freddy's offense is
overwhelmingly outweighed by the extremely inflammatory nature of the Vogt
Street offense evidence. Accordingly, we hold that the trial court abused its
discretion in admitting evidence of the Vogt Street extraneous offense. See
Montgomery, 810 S.W.2d at 392-93.
E. Harm
Analysis
Error under the rules of evidence in the
admission of evidence constitutes nonconstitutional error. See Johnson v.
State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). A reviewing court is to
disregard nonconstitutional error that does not affect the substantial rights of
the defendant. Tex. R. App. P. 44.2(b). A substantial right is affected when the
error had a substantial and injurious effect or influence in determining the
jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App.
1997) (citing Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct.
1239, 1253 (1946)). In Kotteakos, the United States Supreme Court
explained:

 [I]f one cannot say, with fair
 assurance, after pondering all that happened without stripping the erroneous
 action from the whole, that the judgment was not substantially swayed
 by the error, it is impossible to conclude that substantial rights were not
 affected. The inquiry cannot be merely whether there was enough to support the
 result, apart from the phase affected by the error. It is rather, even so,
 whether the error itself had substantial influence. If so, or if one
 is left in grave doubt, the conviction cannot stand.

328 U.S. at 765, 66 S. Ct. at 1248
(emphasis added); see also Motilla v. State, 78 S.W.3d 352, 355-58
(Tex. Crim. App. 2002); Johnson v. State, 43 S.W.3d 1, 4 (Tex. Crim.
App. 2001).
The Supreme Court has defined "grave
doubts" to mean "in the judge's mind, the matter is so evenly balanced
that he feels himself in virtual equipoise as to the harmlessness of the
error." Webb v. State, 36 S.W.3d 164, 182-83 (Tex. App.--Houston
[14th Dist.] 2000, pet. ref'd) (op. on reh'g) (citing O'Neal v.
McAninch, 513 U.S. 432, 435, 115 S. Ct. 992, 994 (1995)). If the reviewing
court is unsure whether the error affected the outcome, the court should treat
the error as harmful, that is, as having a substantial and injurious effect or
influence in determining the jury's verdict. Id.
The defendant is not required to prove
harm from an error. Johnson, 43 S.W.3d at 4. Indeed, there ordinarily
is no way to prove "actual" harm. Id. It is instead the duty
of the reviewing court to assess harm from the context of the error. Id.
Thus, the proper inquiry is whether the trial court's error in allowing the
State to introduce evidence of the Vogt Street extraneous offense substantially
swayed or influenced the jury's verdict, or whether we are left in grave doubt
as to whether this extraneous offense evidence substantially swayed or
influenced the jury's verdict. See Kotteakos, 328 U.S. at 765, 66 S.
Ct. at 1248; Johnson, 43 S.W.3d at 4. In making this determination, we
consider the trial court's erroneous admission of the extraneous offense
evidence in the context of the entire record and not just whether there was
sufficient or overwhelming evidence of the defendant's guilt. See Motilla,
78 S.W.3d at 355-56. As stated in Harris v. State:

 [A] reviewing court in applying the
 harmless error rule should not focus upon the propriety of the outcome of the
 trial. Instead, an appellate court should be concerned with the integrity of
 the process leading to the conviction. . . . If the error was of a magnitude
 that it disrupted the [jurors'] orderly evaluation of the evidence, no matter
 how overwhelming it might have been, then the conviction is tainted. Again, it
 is the effect of the error and not the other evidence that must dictate the
 reviewing court's judgment.

790 S.W.2d 568, 587-88 (Tex. Crim. App.
1989).
Here, the record reveals that the State
spent nearly one-third of the trial proving up the Vogt Street offense, an
"inherently inflammatory" extraneous offense. See Montgomery,
810 S.W.2d at 397; DeLeon, 77 S.W.3d at 316. Twelve
witnesses--including five police officers, a fingerprint expert, a firearms
examiner, the deputy chief medical examiner, three acquaintances of Russell, and
the surviving victim--testified about the offense. Four of these witnesses,
including the surviving victim, testified in depth regarding the
emotionally-charged and gruesome details of the offense. Additionally, the trial
court admitted into evidence seven photographs of the deceased; two of the
pictures showed the victim's nude body at the scene of the offense. In contrast,
while there were sixteen witnesses that testified about the primary offense and
eleven witnesses who testified about the S&A offense, only three photographs
of Chapa and four photographs of Akhras were admitted into evidence.
Although the State did not spend a
substantial amount of time during its closing argument on the Vogt Street
offense, the record shows that the State did refer to it several times,
emphasizing at one point the sexual aspect of the offense. The State's comments
in this regard appear calculated to prejudice the jury against Russell by
casting him as the one who was "in charge" of the sexual assaults of
the two victims. Specifically, the State commented:

        
 In the first place, [Russell] was in charge of the evening entertainment where
 the girls were made to have sex with each other. That's the kind of man he
 is. So his DNA didn't show up there. He was in charge of forcing one of
 them to give him oral sex . . . who was shot, critically wounded five times,
 went to the hospital after vomiting. So you wonder why his DNA didn't show up?
 I suggest to you, you know why. [Emphasis added.]

The sexual assault aspect of the Vogt
Street offense had nothing in common with either the Fast Freddy's offense or
the S&A offense, and the State's emphasis on this aspect of the offense,
albeit short, clearly invited the jury to convict Russell for being "the
kind of man" who would commit the heinous acts comprising the Vogt Street
offense.
The evidence in the record before us
supports Russell's conviction for the capital murder of Chapa. But evidence of
guilt, even overwhelming evidence of guilt, is only one of the factors we are to
consider in conducting a Rule 44.2(b) harm analysis. Motilla, 78 S.W.3d
at 356-57. Extraneous offense evidence can have a devastating impact on the
jury's rational disposition towards other evidence because of the jury's natural
inclination to infer guilt to the charged offense from the extraneous offenses. Abdnor
v. State, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994); see also Mayes v.
State, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). Here, the erroneous
admission of the Vogt Street offense--the detailed, emotional testimony of the
surviving victim, the photographs of the deceased victim, and the testimony of
Russell's accomplices concerning his role in the offense--was of such a
magnitude that in all probability it disrupted the jury's orderly evaluation of
the evidence and had a devastating impact on the jury's rational disposition
towards other evidence. The natural inclination of the jury was to infer
Russell's guilt in the Fast Freddy's offense because "that's the kind of
man he is," that is, the type of person who would force two women at
gunpoint to perform sexual acts on each other for his entertainment. The error
in admitting the detailed testimony and photographs concerning the Vogt Street
offense in the record before us appears to be of a greater magnitude and more
likely to provoke a decision on an emotional basis than the error in the
admission of extraneous offenses or bad acts in several other cases requiring
reversal. See, e.g., Booker, 103 S.W.3d at 533-38; Curtis, 89
S.W.3d at 176-77; Page v. State, 88 S.W.3d 755, 767-68 (Tex.
App.--Corpus Christi 2002, pet. granted); DeLeon, 77 S.W.3d at 312-16; Reyes,
69 S.W.3d at 736-43; Webb, 36 S.W.3d at 182-84; Avila, 18
S.W.3d at 741-42.
After reviewing the entire record,
including all of the exhibits, we cannot say with fair assurance that the
admission of the Vogt Street offense evidence did not have a substantial and
injurious effect or influence on the jury's verdict. In fact, considering the
large volume of detailed, emotionally-presented, inherently inflammatory
evidence presented to the jury about the Vogt Street offense and considering the
State's discussion of this offense during opening statements and closing
arguments, and the fact that twelve witnesses testified during trial concerning
this offense, the record reflects a likelihood that the Vogt Street offense did
have a substantial influence on the jury's verdict. We cannot say, with fair
assurance, after considering the entire record without stripping it of the
erroneous admission of the Vogt Street offense, that the judgment was not
substantially swayed by the error. Accordingly, we hold that the trial court's
erroneous admission of the Vogt Street extraneous offense evidence was harmful
under Rule 44.2(b). We sustain Russell's fifth point.
IV. Conclusion
Having sustained Russell's fifth point, we
need not consider Russell's remaining points. See Tex. R. App. P. 47.1.
We reverse the trial court's judgment and remand the case for a new trial.
 
                                                           SUE
WALKER
                                                           JUSTICE
 
PANEL B: DAUPHINOT, GARDNER, and WALKER,
JJ.
PUBLISH
DELIVERED: July 17, 2003

1. Unless otherwise indicated, all references to rules are
to the Texas Rules of Evidence.
2. The State also cites Ford v. State, 484 S.W.2d
727 (Tex. Crim. App. 1972), but we do not
discuss it because it is not a doctrine of chances case and because Ford
held a subsequent alleged extraneous offense inadmissible.
3. Specifically, in opening statement, the State argued:

 That this Defendant, Kevin Barnes, [and
 others,] all participated in this third capital murder.
        
 And you're going to hear evidence about how after they raped these two women,
 forced these two women to perform oral sex on each other, held these two women
 at gunpoint, fired five shots into Shameka Rice - - She lives. She survives
 somehow - - but how this Defendant shoots Cheron Hill in the head, executing
 her again, which clearly shows his intent to commit capital murder.
        
 . . . .
        
 Once we're done presenting to you all the evidence of these three capital
 murders that this Defendant committed, that he participated in, we will ask
 you to return a verdict of guilty in this case.
 
 4. One of the State's references to the Vogt Street
 offense was:

        
 One of the statements that Andre told you about that this Defendant made to
 him is that "after you've killed so many people, it doesn't matter
 anymore." This statement tells you exactly everything you need to know
 about Carlis Russell and what he did at Fast Freddy's that night, the killing
 of David Chapa, the S&A Food Store and the Vogt Street.